666 F.2d 905
 Mitchell T. HELLER and M & M Investment Company, Plaintiffs-Appellees,
v.
David I. NAMER and National Financial Management, Inc., both
d/b/a Financial Management Services,
Defendants-Appellants.
NATIONAL FINANCIAL MANAGEMENT SERVICES, INC., d/b/a
Financial Management Services, Plaintiffs-Appellants,
v.
Mitchell T. HELLER, II, Mitchell T. Heller, III, Golden West
Corporation, Inn Crowd and Kent White,
Defendants-Appellees.
FIDELITY FINANCIAL OF FLORIDA, INC., Plaintiff-Appellant,
v.
Mitchell T. HELLER, II, Mitchell T. Heller, III, Golden West
Corporation, Inn Crowd and Kent White, Defendants-Appellees.
 No. 79-2579.
 United States Court of Appeals,
Fifth Circuit.
 Unit A*
Feb. 1, 1982.
 
 Terry A. Bell, Gretna, La., for defendants-appellants.
 Stone, Pigman, Walther, Wittmann & Hutchinson, Stephen H. Kupperman, Campbell C. Hutchinson, New Orleans, La., for defendants-appellees.
 Appeal from the United States District Court for the Eastern District of Louisiana.
 Before BROWN and POLITZ, Circuit Judges.**
 JOHN R. BROWN, Circuit Judge:
 
 
 1
 This diversity action arises from the alleged breach of a contract to secure from a savings and loan association a commitment to finance the acquisition of a hotel. As part of the contract, for processing the application fee, the finance company received two checks-the first of which was dishonored by the bank for payment and the second, a replacement for the dishonored check. Subsequently, the first check was re-presented by the payee and paid by the drawee bank. The finance company retained the funds from both checks presumably as partial payment of its fee for securing the loan. The District Court granted summary judgment to the borrower for the amount of both checks and dismissed the counterclaim of the finance company. Finding that no genuine issue of material fact exists since as a matter of law no commitment to finance was issued, we affirm the granting of summary judgment as to the refund of both checks. We find, however, that due to a missing transcript we are unable to review the lower court determination of personal liability and therefore remand for a determination of this limited issue.
 
 The Inn Crowd
 
 2
 In 1977, Mitchell T. Heller (Heller) was seeking a standby loan commitment to help finance the acquisition of a hotel in Odessa, Texas, the Inn of the Golden West. If financing were secured, the hotel was to be acquired by Inn Crowd, a partnership to be formed by Heller, his father, M. T. Heller, II, and Kent White. Frederick Wohlfeld, a loan broker employed by Fidelity Financial of Florida (Fidelity), suggested that Heller contact David Namer to assist in procuring the loan. Namer was president of National Financial Management, Inc. d/b/a Financial Management Services (Financial) in New Orleans. Apparently, Namer and Heller had prior dealings within the previous year, but that transaction aborted prior to securing a loan.[1] Heller came to New Orleans to meet with Namer on September 12, 1977, at which time Heller executed an application form for the loan and delivered to Namer: (1) a check for $25,000, drawn on Heller's father's account in the Arizona Bank maintained under the name "M & M Investment Company," a nonexistent entity, and (2) a transmittal letter.[2] The check was a good faith deposit required to accompany the submission of the application for a loan. At this meeting, the name of the payee of the check was changed from Management Service Consultants to Financial Management Services and the notation on the bottom was also modified.[3] The transmittal letter, signed by Heller's father, was also corrected by the addition of two paragraphs, one correcting the name of the addressee to indicate that "Name of the corporation is Financial Management Services, and not Management Services Consultants," and one amending the provisions concerning the handling of the deposit.[4] The application form provided for Financial to receive $104,000 in fees if an acceptable (i.e., substantially in accordance with the application conditions) commitment was "granted and/or offered", less the application deposit of $25,000.[5] The terms of liquidated damages for failure to accept the commitment and return of the application fee if the commitment was not acceptable were also covered by the form. Fidelity, for its assistance in securing the loan, was also to receive 11/2% fee "payable 1/2% on acceptance of the Namer commitment and 1% on funding."[6]
 
 
 3
 On or about September 23, 1977, Heller was informed that his bank had refused to pay the $25,000 check because of the change in the name of the payee and had returned the check to Namer. After notifying Namer of this wrinkle and negotiating with him, Heller agreed to send Namer a replacement check, but this time for $26,000. This $1000 increase in the amount of the second check reflected the change in the amount of the loan being requested. Although Heller was supposed to deposit 1% of the total loan sought, he had anticipated only a.$2.5 million loan in early September and Namer had agreed to accept the smaller deposit. Apparently, the first check was subsequently re-presented for payment and cleared sometime prior to October 14, 1977. Thus through a fortuitous series of events, at least from Mr. Namer's standpoint, Financial came to hold $51,000 (the amount of the first check and the replacement check), rather than a $25,000 deposit.
 
 Standing By
 
 4
 On October 11, 1977, Heller and Namer spoke by telephone, during which conversation Namer informed Heller that a commitment would be issued and that Heller should be in New Orleans not later than October 21 to accept the commitment and pay, by cashier's check, the balance of the fee. Heller apparently was not particularly receptive to paying the fees without first receiving a copy of the commitment to review, but Namer agreed to send Heller sample language which arrived in Heller's Arizona office on October 13, 1977. On or about October 14, Heller discovered that the first check for $25,000, previously dishonored, had been paid by his bank and requested Namer to return the excess funds. On October 19, 1977, Heller received a telegram stating that a commitment had been issued and requesting that the remaining $53,000 balance of the fees ($104,000 minus deposits of $26,000 and $25,000), now due, be forwarded by October 21 and informing Heller that the commitment would expire if not accepted prior to October 28, 1977. This telegram was also confirmed by a letter dated October 19, 1977. Heller responded to the telegram and letter with another demand for return of the $25,000, informing Namer that the retention of these funds constituted a breach of contract. According to Namer's brief, he never agreed with Heller to return the excess funds because he believed they were already earned and because of the problems he had had in prior dealings with Heller. Counsel for Namer admitted[7] that his client decided unilaterally to retain the full $51,000. Namer responded on October 21, 1977 to Heller's letter, clarifying that the contract was with Financial Management Services as a corporate entity, not David Namer, and stating that Financial had "granted and offered" a commitment substantially in accordance with the terms of the application, both verbally and in writing on October 12, 1977 and on October 19, 1977.[8]
 
 Namer's Show and Tell
 
 5
 On October 27, 1977, Heller, his attorney, and a secretary met in Namer's office with Namer, Wohlfeld of Fidelity, and Namer's attorney. At that time Heller demanded return of the $25,000 which Namer refused, declaring that a commitment had been issued and that all fees were then due. According to Namer, a commitment was tendered and refused. Namer declined to show Heller the commitment or tell who the purported lender would be until Heller either (1) proved that funds sufficient to pay all fees were present in New Orleans or (2) paid all fees.[9] At this meeting, which carried over to October 28, Heller and his attorney were eventually provided with a copy of the "commitment", but with the name of the lender and all signatures whited out. Considerable discussion occurred about the substantive aspects of the commitment, including whether any problems existed in complying with state usury laws and whether Heller would be able to obtain an interim lender based on the commitment. Heller and his attorney were not convinced that the commitment was substantially in accordance with the application and were not willing to pay any fees without first knowing the name of the issuer to verify the stability of that institution.[10] Namer asserts that Heller had no intention of complying with his obligations under the application or of accepting the commitment. Concerning the issue of the anonymity of the proposed lender, Namer points to Wohlfeld's statement that he (Wohlfeld), knowing the name of the lender, believed the commitment was proper, that he could obtain an interim lender on the basis of the commitment, and that he had verified its financial integrity. The meeting of October 28, 1977 ended after Heller demanded a return of his money and Namer refused to return the funds.
 
 
 6
 Apparently on the same day as the first meeting, October 27, 1977, Heller filed an action in federal court to sequester $25,000 (the amount of the dishonored first check subsequently re-presented and paid) in the bank account of Financial.[11] A writ of sequestration did issue on November 1, 1977, but no funds were present in the account sequestered.[12] Heller's amended complaint demanding a return of $51,000 named Financial as an additional defendant. The defendants counterclaimed for damages in the amount of $250,000 caused by the allegedly wrongful sequestration and for additional damages caused by the plaintiff's initiating of allegedly improper criminal complaints with state and local governmental authorities. Financial instituted a separate action in federal court against Heller, his father, Golden West Corporation, Inn Crowd and Kent White to obtain the remainder of the fees ($53,000) allegedly due under the application for the loan commitment. Fidelity also filed suit in federal court against both Hellers, Golden West, Inn Crowd, and Kent White, the same defendants as Financial had, seeking to obtain a commission of $39,000 for the procurement of the loan commitment allegedly obtained by Financial. These cases were subsequently consolidated after which the plaintiffs filed a motion for summary judgment on all issues, including the claims by Financial and Fidelity. Following oral argument, on March 14, 1979, the District Court orally assigned reasons for judgment, granting summary judgment (entered April 11, 1979) against Financial and Namer for $51,000 and dismissing all other actions. A motion for reconsideration was denied on June 6, 1979.
 
 
 7
 In this appeal, Namer, Financial, and Fidelity assert that summary judgment was improper because issues of fact remained. In addition, they assert that the District Court undertook to make credibility choices in the competing affidavits and drew inferences of fact against the party opposing the summary judgment.
 
 Hide and Seek-The Missing Record
 
 8
 During oral argument before this Court it was revealed that the record was incomplete, lacking (1) the transcript of the hearing for summary judgment, during which the District Court judge orally assigned his reasons for granting the motion, and (2) the transcript of the hearing on the motion for reconsideration. At that time we indicated that the parties were to insure that the transcripts were filed promptly. Presently, we have a full transcript of the June 6, 1979 hearing on the motion for reconsideration but only a partial transcript of the March 14, 1979 hearing on the motion for summary judgment. The court reporter not only delayed transcribing the March 14 hearing but also managed to lose a portion of his notes. We mention the lost transcript to emphasize our dismay with the court reporter's carelessness. Fortunately, the hole created in the record can be rewoven but the reconstructing of it requires needless judicial time and effort.
 
 
 9
 We do not find it necessary either to reverse the decision of the District Court on the basis of the lost transcript or to refer the issue back to the District Court for resolution pursuant to F.R.A.P. 10(e). Although nothing in F.R.Civ.P. 56, governing summary judgment, technically requires a statement of reasons by a trial judge for granting a motion for summary judgment, we have many times emphasized the importance of a detailed discussion by the trial judge.[13] Here the parties were informed by the District Court of the basic reason for which the summary judgment was granted. Although we are missing a portion of the transcript of the March 14 hearing, the judge reiterated sufficient reasons for his having granted the motion at the later hearing on the motion for reconsideration on June 6, the transcript of which we have available at this time. As we will discuss in more detail below, Judge Gordon specifically stated that as a matter of law no commitment had been issued.No Issue of Fact-No Commitment Issued
 
 
 10
 Summary judgment is proper under F.R.Civ.P. 56 when no genuine issue of material facts exists and the moving party is entitled to judgment as a matter of law.[14] From the transcript of the hearing on the motion for reconsideration on June 6, 1979, the District Court's granting of summary judgment was based on the judge's conclusion that as a matter of law no commitment had been offered.[15] From the pleadings, affidavits, documents, answers to interrogatories, depositions, and arguments and memoranda of counsel, it is undisputed that two checks from Heller, one for $25,000 and one for $26,000, were negotiated at some time prior to October 14, 1979, the date on which Heller discovered that the first check had been re-presented and paid.[16] There also is no dispute that on October 19, 1979, Namer telegraphed Heller that a commitment "has been issued" even though the commitment itself, eventually submitted with the defendants' motion opposing summary judgment, is dated October 21, 1977. Nor is there any disagreement as to the undisputed fact that at the meeting on October 27, 1977, a copy of the commitment, with the name of the lender and the signatures whited out, was provided to Heller and his attorney. The record contains the loan application which provided that the fee of $104,000 would be earned "should a commitment and/or loan be granted and/or offered substantially in accordance with the conditions" of the application.
 
 
 11
 We agree with the District Court that there was a total failure to prove that a commitment "substantially in compliance" was offered or granted. Heller was not given the name of the lender and could not verify the stability of the proposed lender, or indeed whether a commitment actually existed. Certainly, the lack of the name of the lender made it impossible to determine if the commitment conformed even minimally with the application requirements. Even viewing the evidence in the light most favorable to the party opposed to the motion for summary judgment, the defendants on the evidence asserted by them wholly failed to prove performance of the contract, that is, the granting of a commitment. This determination was not one of the credibility of witnesses or disputed facts, but rather a determination that as a matter of law the presentation of the commitment with the whited out name of the lender and signatures does not constitute proof of the offering or granting of a commitment.
 
 
 12
 Defendant Financial attempts to cloud the water by raising several issues of fact which are peripheral to Heller's establishment of the right to judgment as a matter of law. First, Financial's primary contention is that at the time the first check for $25,000 was re-presented and paid, a commitment had been "issued." Whether the commitment was "issued" or merely "forthcoming", it is undisputed that Heller did not see even a whited out copy of the commitment prior to October 27, almost two weeks after Namer was notified that the second check had been paid. Thus, at the time Financial retained the additional funds, as a matter of law no commitment had been "offered" to Heller.
 
 
 13
 Namer also argues that there is a factual dispute concerning whether he intended to require Heller to pay the fees or only demonstrate the ability to pay the fees prior to being allowed to review the commitment. We find that this issue is irrelevant to Heller's right to recover since it is undisputed that there was no requirement that Heller either pay or prove his ability to pay the fees prior to viewing the commitment. Nor did any evidence from any party raise the possibility of an inference of any such precondition.
 
 
 14
 Since it is clear as a matter of law that Financial could not establish a defense based on performance of the contract, even when viewing the facts in the light most favorable to Financial, we find that the granting of summary judgment for the return of $51,000, the amount of both checks, was proper. No commitment as a matter of law had been offered and therefore no fees had been earned. Financial was not entitled to retain the amount of the deposit since under the application all funds were to be returned if a commitment not substantially in compliance was not accepted.[17] And the retention of the additional funds ($25,000) is equally unsupported since we have determined that no commitment was issued and therefore no fees of $104,000 were due. This also disposes of the separate claim by Namer and Financial for the remainder of the fees. Based on the uncontradicted fact that all Namer showed Heller was a commitment with the name of the lender whited out, there was no performance of the contract. Heller simply does not owe Financial a dime.
 
 
 15
 What's In a Name?
 
 
 16
 While the determination that summary judgment was proper leads us to affirm the judgment as to Financial and Fidelity, we must remand the case for further consideration of the issue of Namer's personal liability. The District Court held Namer personally liable, as well as Financial, for the judgment. Unfortunately, the end of the court reporter's transcript of the March 14, 1979 hearing roughly corresponds with the beginning of the argument on personal liability and thus we have no indication of the District Court's reasoning for finding Namer personally liable. Namer raised a factual dispute whether due to the prior course of dealings between the parties Heller was aware of the corporate status of Financial Management Services. Also Namer asserts that the modification to the September 9, 1977 letter, stating that "Name of the corporation is Financial Management Services, and not Management Services Consultants", along with the verbal discussion, called Heller's attention to the corporate status of Financial Management Services. Heller, both in his motion for summary judgment and in his brief, argued that Namer had a duty affirmatively to bring his agency relationship to Heller's attention and failed to do so. Relying on Louisiana Civil Code, Article 2324,[18] Heller also asserts that the officer, director or shareholder of a corporation who participates, aids or abets the corporation in the commission of a tort or unconscionable act is solidarily liable with the corporation for all loss or damage sustained by a third party. Bluefields S. S. Co. v. Lala Ferreras Cangelosi S. S. Co., 133 La. 424, 63 So. 96 (1913). Heller contends that since the deposit funds were to be held "in tact" and Namer's personal representations induced Heller to send the second check, Namer, as the president, aided in wrongful and tortious conversion.
 
 
 17
 From the abbreviated state of the March 14, 1979 transcript, we cannot determine whether the District Court improperly resolved the factual dispute of Heller's awareness of corporate status or whether, as a matter of law, the District Court concluded that Namer was personally liable. We therefore remand to the District Court the issue of Namer's liability personally both as to the $26,000 application fee and the $25,000 check re-presented and paid. We believe that at the minimum there is no question that Financial was not entitled to retain at any time the $25,000 over and above the amount of the $26,000 required deposit. We do not here decide whether or not Louisiana law views this action, as well as the later refusal to return the deposit of $26,000, as one unlawful under art. 2324, whether Namer actually assisted in an unlawful act, or whether Namer failed to meet any duty to disclose an agency relationship. We leave for the District Court to determine upon remand Namer's personal liability, if any, for tortious conversion or breach of fiduciary duties. While we regret the duplication of judicial effort, we cannot, due to the inexplicable and inexcusable loss of the portion of the court reporter's notes for the March 14, 1979 hearing, here determine whether the District Court acted properly in assessing individual liability.
 
 A Noncommittal Closing
 
 18
 Having disposed of Heller's claim, we briefly touch on the issues raised in the other lawsuits consolidated with this one. We hold that the District Court correctly granted summary judgment in favor of Heller and against Fidelity. The agreement between Heller and Fidelity provided for the payment of fees "on acceptance of Namer commitment" and "on funding." It is undisputed that Heller never accepted the commitment since we found that it was not offered for him to accept, and it is clear that the commitment was never funded. Thus, Fidelity is entitled to no fees. Fidelity's argument that Heller's actions were solely responsible for the failure to fulfill the terms of the application is clearly incorrect based on our holding that Namer did not perform his part of the bargain.
 
 
 19
 Since we found that Namer did not perform his contract, it is clear that he has no basis to recover the remainder of the fees. As to the counterclaim in the original suit, that for malicious prosecution, defamation, and abuse of process, we find these claims frivolous. Before an action for malicious prosecution or defamation stemming from allegations in a lawsuit can be asserted, Louisiana law generally requires that the suit must have terminated. Brown & Root, Inc. v. Big Rock Corp., 383 F.2d 662 (5th Cir. 1967); Marionneaux v. King, 331 So.2d 180 (La.App. 1st Cir. 1976); Calvert v. Simon, 311 So.2d 13 (La.App. 2d Cir. 1975). Not only was the lawsuit not terminated, but in view of the District Court's primary holding and our decision there is no basis in this record for the contention, much less the conclusion, that Heller lacked probable cause for initiating his litigation, especially when Namer re-presented the first check without notice to Heller. Since there was no improper use of process, the abuse of process claim is also without merit.
 
 
 20
 AFFIRMED IN PART, REVERSED IN PART.
 
 
 
 *
 Former Fifth Circuit case, Section 9(1) of Public Law 96-452-October 14, 1980
 
 
 **
 Due to his death on May 15, 1981, Judge Gewin did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d)
 
 
 [1]
 According to Namer, Heller first approached Financial in October 1976 after contacting Eleven West Mortgage and Investment, Inc., requesting a permanent mortgage loan. Namer contacted Heller directly to inform him that while a permanent loan was not available, a standby loan for acquisition and renovation was feasible. Heller had RLS Real Estate Services Corp. submit a proposal which was forwarded to Financial in November 1976. Subsequently Heller contacted Financial, and according to Namer, set up and cancelled three separate appointments before advising Financial that he was no longer interested in financing
 The prior dealings are also substantiated by a letter of August 16, 1977, from Mitchell T. Heller to Wohlfeld of Fidelity, which states in part:
 We've got two other potentials working at the moment ... both qualified institutions that have expressed an interest despite the location, age, etc. Should have a yes or no within the next 14 days.
 In the meantime, have Mr. Namer do what we've been doing for well over a year ... cool his heels a little. As you know, we'll not be rushed or bullied into taking on an extremely expensive standby. While I realize that a bird in the hand ... I want to let nature take over 'til Labor Day.
 Then, we'll either accept the standby or the permanent, whichever is in hand.
 
 
 [2]
 Dear Mr. Namer:
 Attached is a check for $25,000 which is to be held as good faith deposit pending issuance of a commitment in connection with the purchase of the Inn of the Golden West in Odessa, Texas.
 It is understood these funds will be held in tact until such time as commitment is issued. It is further our understanding that should the transaction not materialize, for any reason whatsoever, this check will be returned forthwith.
 Very truly yours,
 M. T. Heller, II
 
 
 [3]
 To the original notation on the check of "Good faith deposit as per ltr of 9/9/77" was added "and application of 9/12/77"
 
 
 [4]
 Check No. 1258, received along with this letter, is accepted with the following modifications
 
 
 [1]
 Name of the corporation is Financial Management Services, and not Management Services Consultants
 
 
 [2]
 Paragraph 2 of this letter is hereby amended to read that in accordance with the application for loan commitment dated September 12, 1977, that should the loan commitment not be forthcoming as per the terms and conditions outlined therein, then the funds will be returned in full
 
 
 [5]
 5. A. Should a commitment and/or loan be granted and/or offered substantially in accordance with the conditions and authorizations of this Application, FMS and/or its nominee, will have earned a permanent and non-refundable fee of $104,000.00 and said fee is due and payable, less the Application deposit amount, without demand
 B. Application Deposit: A cash deposit of $26,000.00, representing one (1)% of the Loan Amount is enclosed herewith. Should this loan application be accepted and should a commitment substantially in accordance with the terms and conditions contained in this Application be offered and/or granted, then the cash deposit referenced above will be earned and retained by FMS and/or its nominee.
 C. If applicant does not accept the loan and/or commitment, then the entire Loan Application Deposit will be retained as liquidated damages.
 D. Should this Application not be accepted or should a commitment and/or loan be offered and/or granted substantially different from the above terms and conditions, and not acceptable to applicant, said deposit will be returned to the borrower, in full.
 Should we, the undersigned applicant, elect not to accept the commitment requested within the time provided for herein, or fail to fulfill the terms and conditions of this authorization and Application, or fail to furnish all information, exhibits, and instruments required to obtain the requested commitment, close the requested loan, and/or fulfill the Application, then the deposit of $26,000.00 shall be retained by FMS, or its nominee, as liquidated damages.
 
 
 [6]
 Wohlfeld, in a letter of September 26, 1977, told Heller that he would accept "a 11/2% fee payable 1/2% on acceptance of Namer commitment and 1% on funding." Heller confirmed this arrangement, stating that he agreed to "1.5%, payable 1/2% on acceptance by us and our bank, the balance on funding."
 
 
 [7]
 At the hearing before Judge Gordon, on March 14, 1979, to consider Heller's motion for summary judgment, the following exchange occurred:
 COUNSEL FOR NAMER: We are now into the question of two checks. The factual issue here is whether or not Defendants at this time were entitled to their full $104,000 fee. The issue there turns on whether or not a commitment, in fact, be issued, or was forthcoming at the time and whether or not Plaintiffs had a right under the factual issues as they then stood, to retain funds. Now-
 THE COURT: Aren't you saying that Mr. Namer decided on his own, unilaterally that he had done that without giving the Plaintiff an opportunity to see whether there had been a commitment?
 COUNSEL FOR NAMER: He wrote them a letter saying that he was retaining the funds at this time to be in his office in order to accept the commitment. At that time they would be given an opportunity to review the commitment and decide whether or not it was in substantial accordance and whether or not the fees were actually earned.
 THE COURT: But, did you have anything to indicate that they acquiesced in the procedure to be suggested in that letter?
 COUNSEL FOR NAMER: There is no indication that they ever acquiesced to that.
 THE COURT: So, he unilaterally decided to keep the second amount?
 COUNSEL FOR NAMER: Well, he decided to keep it.
 THE COURT: Without regard to reason, for convenience or whatnot, you do concede that he unilaterally decided to keep it?
 COUNSEL FOR NAMER: I cannot state differently at this point.
 THE COURT: I am just talking about it before me, I am trying to get straight in my mind, I am not arguing with you.
 COUNSEL FOR NAMER: At this point, he unilaterally decided to keep it, pending their arrival in New Orleans to review the commitment.
 
 
 [8]
 In this letter of October 21, 1977 Namer stated:
 Let us now place our objectives in priority, and understand that, if you want the commitment as applied for in your Application of September 12, 1977, you have but to come to New Orleans and accept same and pay the remaining fees due.
 
 
 [9]
 Heller states that Namer refused to provide the commitment until all fees were paid. In contrast, Namer asserts that he only wanted proof that sufficient funds were available in New Orleans to pay the fees. We find it unnecessary to determine which of these factual characterizations of the situation is correct since the application for the loan commitment neither required Heller to prove that sufficient funds were available nor to pay such fees prior to receiving the commitment
 
 
 [10]
 Namer attached to his Memorandum in Opposition to the Motion for Summary Judgment a transcription of the meeting on October 27, which he apparently taped. Namer, in response to the request by Heller's attorney to know who was offering the commitment so as to determine the financial strength of the institution, stated: "You're not going to know who the bank is until I've been shown that you are prepared to accept this commitment and pay the balance of points. If it means that Mr. Heller you should wire those funds to your own name into an account here in New Orleans, and issue a certified check or cashier's check based on that account, and then we reconvene in the morning at 9:00 or 9:30 we could do that."
 Subsequently, the following exchange took place:
 Counsel for Heller: I'd like to see a commitment tendered.
 Namer: Show me your money and you'll see it.
 
 
 [11]
 The complaint named the defendant as David Namer, doing business as Financial Management Services
 
 
 [12]
 The writ authorized sequestration of $25,000 in the account of Financial Management Services "or in the absence of such account", in the account of Namer
 
 
 [13]
 F.R.Civ.P. 52 specifically states that "(f)indings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 or 56 ...." See Boazman v. Economics Laboratory, Inc., 537 F.2d 210, 213 n.5 (5th Cir. 1976); Jot-Em-Down Store (JEDS), Inc. v. Cotter and Co., 651 F.2d 245, 247 (5th Cir. 1981); Erco Industries Ltd. v. Seaboard Coast Line Railroad Co., 644 F.2d 424, 434 (5th Cir. 1981); Farbwerke Hoeschst A.G. v. M/V "DON NICKY", 589 F.2d 795, 798 (5th Cir. 1979); Mosley v. Ogden Marine, Inc., 480 F.2d 1226, 1226 (5th Cir. 1973)
 
 
 [14]
 Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458, 460 (1962). In deciding a motion for summary judgment, the District Court must view the evidence in the light most favorable to the party resisting the motion. Cubbage v. Averett, 626 F.2d 1307, 1308 (5th Cir. 1980); Joplin v. Bias, 631 F.2d 1235, 1237 (5th Cir. 1980); Northwest Power Products, Inc. v. Omark Industries, 576 F.2d 83, 85 (5th Cir. 1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); BAW Manufacturing Co. v. Slaks Fifth Avenue Ltd., 547 F.2d 928, 930 (5th Cir. 1977). The burden to establish the absence of a genuine issue as to material facts is thus on the party moving for the summary judgment and all doubts must be resolved against the movant. Erco Industries Ltd. v. Seaboard Coast Line Railroad Co., 644 F.2d 424, 428 (5th Cir. 1981). The court, on a motion for summary judgment, may not resolve material factual disputes. Environmental Defense Fund v. Marsh, 651 F.2d 983, 991 (5th Cir. 1981); Kennett-Murray Corp. v. Bone, 622 F.2d 887, 892 (5th Cir. 1980). Nor may it assess the probative value of evidence presented. United States v. An Article of Food Consisting of 345/50-Pound Bags, 622 F.2d 768, 773 (5th Cir. 1980). In essence, summary judgment is reserved for the situation where the moving party has established his right to judgment with such clarity that the non-moving party cannot recover under any discernible circumstance. Joplin v. Bias, 631 F.2d at 1237; Everhart v. Drake Management, Inc., 627 F.2d 686, 690 (5th Cir. 1980)
 
 
 [15]
 THE COURT: If I concluded that there was no material issue of fact surrounding the point that a commitment was never offered, does all this make any difference? Didn't I conclude that under the circumstances of this case that the failure of your clients to offer or disclose all facts pertaining to this alleged commitment, amounted to failure to provide a commitment, among other things, deprived the Plaintiffs of opportunity to examine the credit, integrity of the alleged party whose name you had whited out. I concluded that there was no material issue of fact, it was a matter of law. No offer had been made. If that's so, does this make any difference?
 COUNSEL FOR NAMER: Well, our interpretation, or our search, it is a contract or commitment was, in fact, granted and offered at the meetings between the parties.
 THE COURT: I know that you interpreted it that way, but I reached a contrary conclusion as a matter of law.
 COUNSEL FOR NAMER: Well, I think the documents which have been provided and attached make it clear that there was a commitment granted and had been issued.
 THE COURT: Well, there may have been, but it was a secret, and at that time, there was no way for those people to know that.
 
 
 [16]
 Nowhere in the record is it indicated on what date the first check, the one for $25,000, was negotiated, a fact we do not understand since the check should have been clearly stamped with the date of acceptance
 
 
 [17]
 See note 5 supra
 
 
 [18]
 He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act