UNITED STATES of America,
Plaintiff,

v.

Juan Antonio CONTRERAS,
Defendant.

No. CRIM. H–90–226.

United States District Court,
S.D. Texas.

Aug. 15, 2000.

Paula Offenhauser, Assistant U.S. Attorney, Houston, TX, for Government.

Juan Antonio Contreras, Victorville, CA, Pro se.

Opinion on Remand

HUGHES, District Judge.

1. *Introduction*

This case has not been remanded; it has been delegated. *Remand* would imply that the court of appeals had actually done its work. It did not.

After having the appeal of the summary denial for a year, the court of appeals remanded the case for findings from the district court. Other than the petitioner's name, the opinion contains no case-specific fact in it at all—not one. The opinion identifies no fact that is both (a) essential to the resolution of a claim and (b) the

subject of conflicting evidence in the record. In the absence of these predicates, the law is satisfied when the trial court has made a record and a decision.

The opinion does have two case citations. *United States v. Daly*, 823 F.2d 871 (5th Cir.1987); *United States v. Edwards*, 711 F.2d 633 (1983). Those cases do not have facts parallel to this case; no, they are merely earlier examples of an appellate panel "elaborating" the rules for its own convenience. This is the theme: "Although *nothing* [in the rules] technically requires a statement of reasons by a trial judge ... we have many times emphasized the importance of a detailed discussion by the trial judge." *McIncrow v. Harris County*, 878 F.2d 835, 835 (5th Cir.1989)(quoting *Heller v. Namer*, 666 F.2d 905, 911 (5th Cir.1982))(emphasis added), as quoted in *O'Neill v. Air Line Pilots Ass'n Intern.*, 886 F.2d 1438, 1443 (5th Cir.1989), *rev'd*, 499 U.S. 65, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991)(affirming trial court *still* without a trial-court opinion).

The rule says, "Findings of fact and conclusions of law are *unnecessary* on decisions of motions under Rule 12 or 56 or any other motion." FED.R.CIV.P. 52(a)(emphasis added). The petition here is governed by a rule that says, "Unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief, the court shall ... determine the issues and make findings of fact and conclusions of law...." 28 U.S.C. § 2255. No issue has been identified on appeal that would lawfully require a finding. Rather, the case was returned for help with the paperwork; that is not judging—it is dodging.

The court of appeals has roughly seventeen judgeships, fifty-one law clerks, and fifty staff attorneys. It does not have the district court as additional staff. While an appeal lies from district court to the court of appeals, district courts are not local branches of its operation—just as courts of appeals are not regional branches of the Supreme Court. The distinction between route of appeal and subordination of institution is important for the vitality of judging at each level; intra-branch independence keeps the American judicial process from resembling a slouch up through the Department of Interiors's layers. Even if, as it occasionally asserts, the court of appeals had some general supervisory power over the trial court separate from its appellate responsibilities, that authority would not extend to shifting its work to the district court.

Courts of appeal should expect—and even hope—that the sources of their cases constitute "a Court unwilling to be simply a reference librarian to its Superior Court." B. Ward, *Tribute to Clement F. Haynesworth, Jr.*, 665 F.2d LXXXVI (1981).

In this court's imposed capacity as an honorary briefing clerk to the court of appeals, here is the application of the record to Contreras's claims.

### 2. *Petition & Law.*

The petition is not clear, so the court has tried to put Contreras's text into as plausible a claim as it reasonably could support.

■ By Contreras's count, this is his fifth post-trial action. Under any interpretation of the writ of habeas corpus, a fifth action after seven years is presumptively specious, but courts read them and check the record because it is just possible that a good claim has been newly discovered. These claims are not new.

Contreras raises several complaints about his trial. None of them is the kind of gross failure of regularity that would implicate the court's responsibility for fundamental justice. In the aggregate they

are not substantial. A couple of them he raised and lost on his direct appeal.

■ Except for the assertion that he was used by his counsel, his claims all could have been brought in his appeal. Because he has no excuse for not bringing them then, he may not bring them now. Without a cause for omitting these claims from his appeal, he does not reach the question of harm since he needs to have both a good reason and a bad result. *United States v. Frady,* 456 U.S. 152, 168, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

The facts supporting these claims were known to Contreras at the time of trial and appeal. The only new "fact" is an amendment to federal law in 1996 that would have made a good faith arrest for immigration charges by a local policemen lawful. He also urges as new, lenient law a holding in a case that is quite unlike his.

### 3. *The Crime.*

As a police officer for the city of Laredo, Juan Contreras arrested Patricia Orozco, drove her to a secluded location, and raped her. After his indictment in state court for rape, Contreras attempted to kill Orozco to keep her from testifying. He was tried in this court on federal charges arising from his violation of her civil rights and interference with a federal witness. Contreras was sentenced to 61 years.

### 4. *Ineffective Counsel.*

■ Contreras says that his lawyer was crippled in his ability to help Contreras because it was the lawyer's bad advice that got him into trouble with the federal authorities. Contreras claims—now—that he was investigating Orozco's case against him for rape rather than attempting to kill her. He says that he was only investigating her at the request of his counsel in the Webb County prosecution, Gregory Zaney. Since it was his counsel who exposed Contreras to these charges, Contreras says that the lawyer's performance was insufficient for the minimum level of assistance that the Constitution requires. He also claims that Zaney's performance was hampered by the resulting "conflict of interest" because the attorney did not want the Texas bar to discover that he had had a client investigate his own case.

■ When a petitioner claims that he had ineffective counsel because his lawyer's interest conflicted with his own, he must establish that his attorney performed below a reasonable level of competence and harmed the defense. *Strickland v. Washington,* 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Beets v. Scott,* 65 F.3d 1258 (5th Cir.1995)(adopting *Strickland* for conflicts that do not involve multiple clients). Harm occurs when the flawed performance leads to an unfair result. *Lockhart v. Fretwell,* 506 U.S. 364, 371, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

Assuming that the background facts were true, Contreras is wrong in the conclusions that he draws from them. A lawyer's asking a client to help with his own defense is not an error. If it were an error, it was in the state prosecution—not in this federal case. If it were an error, it is not a conflict of interest. If it were a conflict of interest, it did not result in an unfair conviction. Contreras has made no effort to meet his responsibility to identify an act of his lawyer in the presentation of the case that (a) was wrong objectively, (b) cannot be explained tactically, and (c) probably caused the adverse verdict.

As anyone who read the record would know, Contreras testified at the trial that he wanted to find Orozco to "give her the same kind of headache she's been giving me." In his petition, he admits that he offered to track down Orozco and that Zaney merely accepted his help. He cannot reopen the evidence to contradict himself.

The whole concept of Zaney's needing Contreras to find Orozco is bizarre. Orozco was not a missing witness; she was the complaining witness.

If Contreras had chosen to help his lawyer obscure the bad advice to investigate Orozco, as he now says, that was his choice, and it binds him now.

If Zaney did suggest that Contreras investigate Orozco, it was not unethical. Regardless, Contreras has no specifics of Zaney's telling him to investigate Orozco. It is hard to imagine a lawyer's advising a client to investigate on the eve of his trial with a pistol, mask, and gloves in hand. In the four months between his indictment and trial, Contreras investigated Orozco only to the extent of finding her address in Nuevo Laredo, just across the Rio Grande in Mexico. Neither of the accomplice witnesses spoke of anything connected to the lawyer; they both confirmed Contreras's 1990 version.

The record conclusively shows that Contreras was helping himself directly without the intervention of counsel's advice. Contreras, not his lawyer, recruited a confessed accomplice. If he were actually investigating her, he would have started months earlier, leaving the pistol, mask, and gloves at home. The facts conclusively show that Contreras was on his way to kill Orozco, not to investigate her.

This is not a case where the client was ignorant of his opportunities and unaware of his lawyer's errors. Contreras actually fired Gustavo Acevedo, the court-appointed lawyer, and replaced him with Zaney. Contreras claims that other lawyers heard him assert the investigation defense, but in a decade he has not produced that testimony, and the jury heard Contreras from the stand explain his actions. He had an opportunity then to tell his story his way, but he did not mention advice of counsel. Even if it were true that Zaney did not present the investigation defense, he is presumed to have omitted it because it is no defense rather than in an attempt to obscure his malpractice. *See generally Jones v. Barnes*, 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983)(holding that attorneys and not clients choose the arguments to present.)

Just as every error at trial can be twisted into a claim that counsel failed, every error can be imagined to create a potential conflict. In cases of representation of multiple defendants, it is a conflict of loyalties—of duties. In cases of assignments of rights to the story, it is a confusion of roles—of focus. In this case, it is no conflict, no confusion. Even a loose use of "conflicts of interests" would not convert every unethical act of a lawyer into cross purposes with his client. Federal courts are policing the constitutional protection of an opportunity to have the help of reasonably apt advice from a lawyer in the course of prosecution—not substituting for the higher standards of bar associations.

Contreras also complains that neither the court nor Zaney advised him of his right to appeal; if true, it is moot because he did appeal. Parenthetically, Contreras suggests that he was trapped with Zaney, but the facts are that Contreras was an experienced Laredo policeman, carrying knowledge of what defendants may do, and of course, he did fire Acevedo to have Zaney. The facts do not mesh with his claims.

### 5. *Anonymous Jury.*

■ Contreras says that his opportunity to participate in selection of the jury was eviscerated because the court withheld jurors' biographical data from him personally. Contreras admits that this is not in the record. Bench conferences are ordinarily recorded. At the distance of ten years, the court has no recollection, but it sounds like something that might well

have been done. Withholding of limited information was a reasonable precaution for the jurors' safety, considering the charge that Contreras had earlier attempted to murder a witness. *See U.S. v. Krout,* 66 F.3d 1420, 1427 (5th Cir.1995) (finding that a defendant's past attempts to interfere with witnesses justifies protecting jurors).

Juror addresses are not routinely published to the parties or their counsel. As is manifest in the record, Contreras's attorney had full access to juror information on the one-page, thirty-eight-question form used in this court. Defense counsel and the prosecution were allowed to question the veniremen, many of whom were identified by name during the process. The lawyer and Contreras could confer about issues raised about the jurors. Contreras was present during the court, prosecution, and his counsel's examination of the prospective jurors. One Hispanic served on the jury—Contreras struck another Hispanic.

Contreras suggested no way that his defense was impaired by the precaution. Contreras did not object to whatever restriction there was at the time or later—until now. The names of the jurors have been public record since October 1990—more than two months before Contreras filed his appeal. This is an issue that was present and obvious in time for Contreras to have put it in his appeal in December 1990.

## 6. *Illegal Arrest.*

■ Contrereas was convicted of depriving Orozco of her civil rights. 18 U.S.C. § 242 (1990). Contreras attacks his conviction on the count of falsely arresting Orozco because immigration law has been changed to allow municipal police officers to arrest people whom they reasonably suspect of being illegal aliens.

The change in 1996 to permit local officers to assist in enforcing immigration law does not make Contreras's conduct in 1990 legal. Of course, Contreras did not arrest Orozco for an immigration violation; he arrested her because she was pretty and apparently vulnerable. Her vulnerability arose because of Contreras's assumption that an illegal alien would not have the temerity to report a crime against her by an officer. In that sense and only in that sense did he arrest her because she was an illegal alien. He arrested her for his own reasons using the authority of the state.

The face of the record plainly shows that Contreras did not arrest Orozco because he had probable cause to believe she was an illegal alien; he arrested her so he could rape her. If he had seen her commit a state-law felony and if he arrested her for his personal purpose of rape, his arrest would still have been wholly illegal. Contreras's conviction for falsely arresting Orozco was proper.

## 7. *Constitutional Rape by a Government Official.*

■ Contreras claims that he should not have been convicted for a civil rights violation through his raping Orozco while she was in his custody. He says that using—misusing—his governmental authority to prey on a woman did not deprive her of a constitutionally guaranteed right. If one were trying to list unreasonable seizures on a scale from the worst to the least significant, the worst would be characterized by the scope of the physical intrusion—like death—and the cultural offensiveness of the damage—like rape. In societies without a constitution that hold the state accountable, rape is a traditional governmental means of attacking opponent populations because of its social devastation. It fits with torture and maiming.

The most supine judicial apologist for state authority has not dared to hint that

under our Constitution sexual assault can be supposed ever to have had a legitimate governmental purpose. While the integrity of each person's core humanity is protected from assault by the government, this case rests squarely athwart the text that prohibits unreasonable seizures, a clearly established proposition since 1791. Rape was among the tools of the Ku Klux Klan whose criminal brutality with government connivance helped motivate the statute that was eventually applied to Contreras. *See* ERIC FONER, RECONSTRUCTION 430 (1988); NANCY MACLEAN, BEHIND THE MASK OF CHIVALRY 141–44 (1994). Contreras's conviction on the count of injuring Orozco in a sexual assault while he had detained her through the indicia of state authority was proper.

## 8. *Jurisdiction.*

■ Contreras insists that the federal jurisdiction is defective because there was no federal investigation in operation at the time he tried to kill Orozco. This claim is couched as an absence of jurisdiction, but it really is a sufficiency of evidence claim. The jury was instructed that it had to find that there was a federal proceeding involving Orozco as a witness. A federal connection was an element of the offense, so this court had jurisdiction.

Addressing it as an argument that the evidence was insufficient: At the time of his arrest, Contreras's accomplice was wearing a radio transmitter taped to him by the Federal Bureau of Investigation. As both trial and appellate records plainly show, federal jurisdiction had attached because there was a real and substantial likelihood that a civil rights claim would arise from a police officer using his authority to extort sex.

This point was argued on direct appeal as a sufficiency of the evidence claim, and Contreras may not raise it again.

## 9. *Firearm.*

■ Contreras says that the facts introduced to prove his use of a firearm in the other crimes do not show anything more than mere possession of the pistol. The jury convicted him of using a firearm in the rape and attempted murder. He now objects to the jury instructions on use, and he says that the firearm was not used in the sense required by law. *Bailey v. United States*, 516 U.S. 137, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). The rule that the evidence must support the offense of conviction is not a new constitutional rule; even if it were, Contreras's use of the firearm is categorically distinct from merely possessing a gun or even of merely carrying a gun at the time. *Triestman v. United States*, 124 F.3d 361, 372 (2d Cir. 1997).

### A. *Jury Instructions.*

■ Contreras's objection to the jury charge is that it did not quote the statute. Statutes are not self-articulating. If the statutes were routinely comprehensible by normal people, we would not need instructions. Neither quotations nor citations are the substance of jury instructions.

The statute says that whoever "uses or carries" a firearm "during and in relation to" a crime of violence violates the law. 18 U.S.C. § 924(c)(1)(1990). The indictment said "used and carried" a handgun. The jury were given individual copies of the written charge. The jurors were told that they must find that Contreras "used or carried the firearm in relation to a crime of violence." Special Instructions, ¶ 12.

### B. *Use in the Rape.*

Contreras's acts meet the statute's requirements. In the seizure, he was bur-

dened with symbols of authority—a nightstick, handcuffs, uniform, badge, and patrol car—but the killer tool was a pistol. He wore the pistol when he accosted her in town; when he lowered his trousers, he drew his pistol, brandished it, and placed it on the roof of the car for instant access.

### C. Use in the Tampering.

When Contreras attempted to murder Orozco, he used and carried a firearm. The testimony about the attempted murder illuminated Contreras's efforts to get a pistol. The people whom he first asked for help in finding her were told about the gun. He told his accomplices that the gun was a device to control testimony. Finally, on the tape, as he is driven toward Orozco's home, Contreras can be heard dry firing the specific-purpose pistol and saying that this will silence Orozco.

The evidence is clear that he "used and carried" a firearm as charged in the indictment in direct and substantial relation to a crime of violence. Since *use* is a higher burden than *carry*, the government necessarily met the proof required for *carry* too, and it did. Contreras was properly convicted for using *and* carrying a firearm during a crime of violence.

### 10. Witness Tampering.

██ Contreras's claim that there was insufficient evidence to support his conviction for tampering with a federal witness was argued on appeal, and the facts have not changed since then. 18 U.S.C. § 1512.

His two accomplices testified for the government. The FBI recorded Contreras as he drove towards Orozco's house. Contreras is heard to ask the informant whether he brought a mask and gloves, and he is heard testing the pistol. The accomplice witnesses also testified that Contreras planned to kill Orozco to prevent her from testifying against him. Tampering with a witness is a concept that includes murdering her to prevent her testifying.

### 11. Conclusion.

As one would conclude from the terror and stupidity of his crimes, Contreras has constructed an internal reality that does not correspond at all with that of regular Texans. In one moment of misguided legalism, he billed the court $393 million in damages for his imprisonment.

Even a thug who perverted governmental authority must have his case adjudicated in a regular, rational manner—in the American system at least. The record includes trial transcripts, pleadings, motions, letters from Contreras to the court, opinions on appeal, and a wealth of other information. This record evinces performance by the court, prosecutor, and defense counsel that exceeded the constitutional minimum at every point. It took work for the district court to produce the record, and it would have been work for the court of appeals to understand it.