**In the Matter of the Complaint of HERCULES CARRIERS, INC., for exoneration from or limitation of liability as owner of the M/V SUMMIT VENTURE.**

**No. 80–563–Civ–T–GC.**

United States District Court,
M.D. Florida,
Tampa Division.

March 14, 1983.

Dewey R. Villareal, Jr., Carl R. Nelson, Fowler, White, Gillen, Boggs, Villareal & Banker, P.A., Tampa, Fla., for petitioner.

Roger A. Vaughan, Wagner, Cunningham, Vaughan, Genders & McLaughlin, Tampa, Fla., Bill Hoppe, Hoppe & Backmeyer, Miami, Fla., for the Wrongful Death and Personal Injury Claimants.

David G. Hanlon, Ben Hill, Shackleford, Farrior, Stallings & Evans, Tampa, Fla., Richard G. Rumrell, Smathers & Thompson, Jacksonville, Fla., G. Morton Good, Smathers & Thompson, Miami, Fla., for State of Fla.

Richard F. Ralph, Miami, Fla., for Greyhound.

David V. Hutchinson, Admiralty & Shipping Section, U.S. Dept. of Justice, Washington, D.C., for United States.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

DANIEL HOLCOMBE THOMAS, Senior District Judge.

The above-styled and numbered cause was heard by the Court without a jury and taken under submission on the 20th day of December 1982. After hearing the evidence between October 12–21, 1982, examining the exhibits, pleadings, stipulations, and proposed findings of fact and conclusions of law for all parties, this Court makes the following Findings of Fact and Conclusions of Law as to the issue of Hercules Carriers, Inc.'s right to limit its liability pursuant to 46 U.S.C. §§ 183 *et seq.*:

## FINDINGS OF FACT

### Background

1. At about 0734 on May 9, 1980, the SUMMIT VENTURE struck the Sunshine Skyway Bridge near the mouth of Tampa Bay. On May 12, 1980, Hercules Carriers, Inc., as owner of the SUMMIT VENTURE, filed its complaint pursuant to 46 U.S.C. §§ 183 *et seq.* and Rule F, Supplemental Rules for Certain Admiralty and Maritime Claims, praying alternatively for exoneration from or limitation of liability with respect to all claims for damages against Hercules Carriers, Inc. arising out of the collision of the SUMMIT VENTURE with the Sunshine Skyway Bridge on May 9, 1980. Claims in concourse were filed by the State of Florida (for damages to the bridge and loss of use of the bridge); wrongful death and personal injury claimants; Greyhound Bus Lines, Inc. (as owner of a bus which went into the Bay); and several shipowners and owners of facilities depending upon shipping (for delay or economic losses). Hercules Carriers, Inc. counterclaimed against the State of Florida and Greyhound Bus Lines, Inc. and filed and served a third-party complaint against the United States. The United States counterclaimed against Hercules Carriers, Inc., and other parties filed cross-claims. On Hercules Carriers, Inc.'s motion the delay claims were dismissed. Delay claimants presently have an appeal pending in the Eleventh Circuit Court of Appeals. The remaining claimants moved for partial summary judgment that Hercules was not entitled to exoneration. The district judge to whom this case was assigned, the Honorable George C. Carr, found Pilot Lerro negligent, granted claimants' motion for partial summary judgment, and denied Hercules Carriers, Inc. exoneration. Hercules has taken an appeal from the order denying exoneration to the Eleventh Circuit Court of Appeals. Claimants also filed motions for partial summary judgment holding Captain Liu, master of the SUMMIT VENTURE, negligent and Hercules Carriers, Inc. not entitled to limitation of liability. These later motions for partial summary judgment were carried with the case through trial and will be mooted by these findings and conclusions.

2. The trial between October 12th and 21st, 1982, was limited to the issue of the right of Hercules Carriers, Inc. to limit its liability pursuant to 46 U.S.C. §§ 183 *et seq.* The various counterclaims, cross-claims, and the third-party claim pending in this cause were not issues for consideration at this trial.

### Stipulated Facts

The following facts were stipulated by the parties:

3. Hercules Carriers, Inc., a Liberian corporation, was the registered owner of the SUMMIT VENTURE at all material times.

4. Hercules Carriers, Inc. had time chartered the SUMMIT VENTURE to Showa Lines at all material times.

5. Showa Lines had sub-chartered the vessel to Yamashita Shinnihon Lines at all material times.

6. The SUMMIT VENTURE came to Tampa to load a cargo of bulk phosphate products. She arrived off the sea buoy on May 6, 1980, at 1634 hours. The ship had called at Tampa once in each of the preceding three years.

7. Dates and times as noted in the log books, bell books, engine order logger, and course recorder of the SUMMIT VENTURE are the best evidence of the facts as to those dates and times.

8. The SUMMIT VENTURE was a diesel powered bulk carrier with the engine room and superstructure aft. She was built in 1976 in Japan to the rules of the American Bureau of Shipping and was 609 feet in length, 51 feet in depth, 85 feet in breadth and was, on the morning of May 9, 1980, drawing 9 feet forward and 21 feet aft. She was equipped with two 3 centimeter radars manufactured by Japan Radio Corporation.

9. The SUMMIT VENTURE was originally scheduled to get underway from her

anchorage near the Tampa sea buoy on May 9, 1980, at or about 0500.

10. The vessel's schedule was delayed at the recommendation of the pilot. Her anchor was heaved up at 0543 and she proceeded toward the sea buoy where she was boarded by Tampa Bay Deputy Pilot Lerro and Tampa Bay Observer Pilot Atkins at about 0625 near the entrance to the Egmont Channel.

11. Shortly thereafter Atkins took the conn and conducted the vessel into Egmont Channel. After the pilots took the conn the master did not take it again before the collision. The engine speed was increased to full speed ahead at 0650.

12. At 0639 the vessel passed buoys 3 and 4 in Egmont Channel.

13. At 0706 the vessel passed Egmont Key lighthouse.

14. At 0721 the engine speed was ordered reduced to half ahead.

15. At 0723 the vessel was at buoys 15 and 16.

16. When the vessel reached a position two-tenths of a mile west from buoys 1A and 2A, radar contact with the buoys was lost.

17. When the vessel was one-tenth of a mile west from buoys 1A and 2A, radar contact was regained for one or two sweeps of one radar.

18. At 0731 the engine speed was ordered reduced to slow ahead.

19. At 0732.5, Lerro ordered double full astern, hard aport, and let go anchors.

20. Subsequently the starboard bow of the SUMMIT VENTURE came into contact with pier 2S on the Sunshine Skyway Bridge. A part of the bridge fell on the forecastle of the vessel and the spans of the bridge going northward from pier 3S to more than halfway between 1S and 1N collapsed.

21. Several vehicles fell into the Bay, including a Greyhound bus, resulting in the deaths of 35 people and injuries to 1.

22. At all material times Venture Shipping (Managers) Ltd. was the general agent

and Wah Kwong Shipping Agency Company Ltd. was the sub-agent for Hercules Carriers, Inc. with respect to the SUMMIT VENTURE.

23. There was no error in the SUMMIT VENTURE's gyro compass. The gyro compass accurately indicated true headings.

24. Deputy Pilot Lerro was a compulsory pilot.

25. At all material times the 1970 edition of *East Coasts of Central America and Gulf of Mexico Pilot* was onboard the SUMMIT VENTURE.

*Facts Adduced from the Evidence*

The remaining facts were adduced from the evidence at trial.

*Ownership and Registry of the SUMMIT VENTURE*

26. The SUMMIT VENTURE was owned by Hercules Carriers, Inc., a Liberian corporation, and the vessel was registered under the laws of the Republic of Liberia.

27. The stock of Hercules Carriers, Inc. was owned by a wholly owned subsidiary of Wah Kwong Shipping & Investment Co., Ltd., of Hong Kong.

28. Hercules Carriers, Inc. appointed Venture Shipping (Managers), Ltd. as its general agent for the oversight of the building and operation of the SUMMIT VENTURE. Venture Shipping (Managers), Ltd. appointed Wah Kwong Shipping Agency Company as the sub-agent for the oversight of the construction, crewing, and operation of the vessel.

*Pilots, Officers and Crew*

29. On May 9, 1980, the navigating team on the SUMMIT VENTURE was composed of Deputy Pilot John Lerro, Observer Pilot Bruce R. Atkins, Captain Hsiung Chu Liu, and Chief Officer Chan Csin Yee. Off watch and not involved in the navigation at material times were Second Officer Sun Chi Kong and Third Officer Lai Ying Ki. The bo'sun (lookout) was Sit Hau Po, the carpenter (anchor watch) was Lok Lin Ming,

and the helmsman was Wong Sau Ho, an able bodied seaman.

30. Deputy Pilot John E. Lerro, 37, held a United States Coast Guard license as master, steam and motor vessels of any gross tons upon any ocean, which was endorsed to show his qualifications as a radar observer, and as first class pilot for: Port Everglades, sea buoy to port docks; Miami, main ship channel and turning basin; Tampa and Hillsborough Bay from sea buoy via main ship channel to Tampa; and Old Tampa Bay to Port Tampa. His pilot's endorsement for Tampa was issued on September 9, 1977, at Tampa, Florida. He had sailed as third mate, second mate, and master from 1964 to 1967 and had served as a pilot in the Panama Canal for 11 months. Pilot Lerro was certified as a deputy pilot for the Port of Tampa by the State of Florida. In the three and one-half years prior to May 9, 1980, he had completed 788 transits through Tampa Bay, many in vessels similar to the SUMMIT VENTURE.

31. Observer Pilot Bruce R. Atkins, 32, was aboard the SUMMIT VENTURE as an observer pilot/trainee. Atkins held a Coast Guard license as master of steam and motor vessels of any gross tons upon any ocean (and inland waters of the United States) endorsed as a first class pilot for New York Harbor and for Tampa Bay. His master's license was issued on July 1, 1976, at Boston, Massachusetts, and was endorsed to show his qualifications as a radar observer. He was a graduate of the United States Merchant Marine Academy, and had sailed as a deck officer for ten years, three and one-half of these as master. May 9, 1980, was the last day of his 30 day period as an Observer Pilot before beginning work as a state-certified Deputy Pilot on Tampa Bay.

32. Captain Hsiung Chu Liu, 50, had been master of the SUMMIT VENTURE since February 12, 1980. He graduated from the Nationalist Chinese Naval Academy in 1951, and served as a commissioned officer on a variety of vessels before retiring from the Chinese Navy, as a lieutenant commander in 1961. On a destroyer he served as combat information center watch officer, the training for which included training on the use of radar and radar information. After retiring from the Navy, Captain Liu served as second officer for two years and as chief officer for five years on Chinese merchant vessels.

He served as master for eight years on ships managed by Wah Kwong Shipping Agency Company, or its predecessor, before taking command of the SUMMIT VENTURE for commissioning in 1976. Captain Liu holds licenses authorizing him to serve as master of oceangoing vessels of any gross tonnage from the Republic of China and the Republic of Liberia. The Chinese master's license was obtained by sitting for an examination in the Chinese language, and the Liberian master's license was obtained by sitting for an examination in the English language. Captain Liu holds a Liberian radar observer's certificate obtained by taking and passing an examination in English in New Orleans, Louisiana, administered by the American Bureau of Shipping. He took the examination during April of 1980. His certificate is dated May 8, 1980. Before the accident, Captain Liu had served as master of at least eight vessels operated by Venture Shipping, Ltd. Presently he is master of the CHASE VENTURE (a very large crude carrier "VLCC" of 280,000 DWT) and has been since January 1, 1981. He came directly from the CHASE VENTURE to Tampa to testify at trial.

33. Other than the accident involving the SUMMIT VENTURE and the Skyway Bridge, Captain Liu has never been involved in a collision with another ship or a dock or a bridge. He has never served on a ship which grounded or sustained damage because of a navigation problem. Captain Liu can read and understand the English language.

34. Chief Officer Chan Csin Yee, 50, had served as chief officer of the SUMMIT VENTURE for eight months. With the exception of three years, he has been going to sea since the age of 18. After attending the Wong Ham Mang Navigation School in Hong Kong, he had sailed as a licensed

officer since November 7, 1963, on at least twelve vessels, most of them operated by Venture Shipping, Ltd. He obtained a Liberian license in 1977 authorizing him to serve as master of oceangoing vessels of any gross tonnage. Chief Officer Chan kept logs in English, communicated with stevedores in English, corresponded with Wah Kwong Shipping Agency Company in English, and communicated with Pilots Lerro and Atkins in English. Chan could read and understand the English language. After the accident, his Liberian license was recalled because the Chinese license upon the strength of which the Liberian license had been issued could not be validated. A Liberian license was once again issued to Chief Officer Chan on February 23, 1982, based upon an examination given by the Liberian Government. While serving as chief officer of the SUMMIT VENTURE on the morning of the accident, Chan was serving with an invalid license.

35. Second Officer Sun Chi King, 35, began his seagoing career in 1965 as a fireman. He studied for this third mate's license at Kwen Tak School in Kowloon, Taiwan, and served as second officer from 1977. Sun Chi Kong, in the normal course of his duties, made entries in the SUMMIT VENTURE's deck log in English. He also prepared deck log abstracts in English. He testified that he could not read English. Sun Chi Kong made standard compass error notations in the logbook correctly; and, according to Captain Liu, he knew how to apply variation and deviation to obtain compass error. His Liberian license, like that of the Chief Officer, was recalled because the underlying Chinese license could not be validated.

36. Lai Ying Ki, 25, third officer of the SUMMIT VENTURE, started going to sea in 1973. He began serving as third officer for Wah Kwong Shipping Agency Company in 1976 and as a second officer in 1978. In the normal course of his duties, Lai Ying Ki made entries in English in the SUMMIT VENTURE's deck log, and his deposition was taken in English. Lai Ying Ki could read and understand English sufficiently well to carry out his duties on May 9, 1980.

37. Sit Hau Po, 60, was serving as bo'sun on the SUMMIT VENTURE. He had been going to sea for 38 years, seven or eight of them as bo'sun. He had worked for Wah Kwong Shipping Agency Company for more than 10 years. On May 9, 1980, Sit Hau Po was sent forward as the lookout and remained in the "eyes" of the ship until after the carpenter dropped the port anchor.

38. Lok Lin Ming, 64, was serving as carpenter on board the SUMMIT VENTURE on May 9, 1980. He had been going to sea for more than 40 years and had been working for Wah Kwong Shipping Agency Company since 1975. Lok Lin Ming was sent forward as the anchor watch on May 9, 1980.

39. Wong Sau Ho was the helmsman on duty on the SUMMIT VENTURE from about 0700 until the time of the collision with the Sunshine Skyway Bridge. He was 48 years of age and had been going to sea since 1955. Wong Sau Ho correctly carried out the commands given him by the pilot.

*From Japan to the Tampa Bay Sea Buoy*

40. Before coming to Tampa, the SUMMIT VENTURE had carried a cargo of steel products from Japan to New Orleans and Houston. She then went on charter to Yamashita Shinnihon Lines upon dropping the outbound pilot near the Houston sea buoy on May 4, 1980. From Houston she proceeded in ballast across the Gulf of Mexico to Tampa to take on a phosphate cargo for discharge in Korea. Crossing the Gulf, her draft was 14 feet 9 inches forward and 21 feet 6 inches aft.

*From the Tampa Bay Sea Buoy to Accident*

41. The SUMMIT VENTURE was originally scheduled to get underway from her anchorage near the sea buoy on May 9, 1980, at or about 0500 but was delayed at the recommendation of Tampa Bay Pilot John E. Lerro due to rain showers and visibility problems in the area.

42. The weather forecast for the morning of May 9, 1980, by the National Weather Service revealed that severe thunderstorms were likely. Captain Liu failed to avail himself of this information; the last weather report received before the collision was on May 8, 1980, at approximately 1020. Although Captain Liu relied on the pilot to know local weather conditions, Liu never asked the pilot what weather was anticipated for passage up the Tampa Bay.

43. The distances between the relevant buoys were: 1.42 miles from the lighthouse to buoy 11; .45 miles from buoy 11 to buoy 12; .45 miles from buoy 12 to buoy 14; 1.3 miles from buoy 14 to buoy 16; 1.3 miles from buoy 16 to turning buoy 2A; .7 miles from turning buoy 2A to the bridge. See chart attached hereto as Appendix A.

44. When the SUMMIT VENTURE's anchor was eventually weighed at 0543 on May 9, 1980, Captain Liu was in command, Chief Mate Chan was the navigational watch officer and Wong Sau Ho was on the bridge as the helmsman/quartermaster. The vessel proceeded toward the sea buoy, where she was boarded by Lerro and Tampa Bay trainee pilot Bruce Atkins at 0625. At that time, visibility was approximately three miles, the sky was overcast with scattered rain showers.

45. Shortly after the vessel entered Egmont Channel, the conn of the vessel was turned over to Trainee Pilot Atkins. At 0650, in the vicinity of buoy 6, the speed of the vessel was increased to full ahead or 13 knots over the water. When the SUMMIT VENTURE was abeam of buoy 8 at 0700, the weather, specifically the rain storms and the wind, was progressively getting worse. As the vessel passed abeam of the lighthouse at 0706, the intermittent rain had turned to a heavy rain. Between the lighthouse and buoy 12, the SUMMIT VENTURE met the M/V GOOD SAILOR.

46. In the vicinity of buoy 12, at approximately 0715, the SUMMIT VENTURE established radio communication with an outbound tanker, the M/V PURE OIL, and at that time the M/V PURE OIL was located in B Cut, somewhere to the east of buoys 1B and 2B. This was the last radio communication which the SUMMIT VENTURE had with the M/V PURE OIL. At buoy 12, the weather was noticeably deteriorating, and the sky was very dark and turbulent. Nevertheless, even though the M/V SUMMIT VENTURE was equipped with two radar sets, neither the master nor the pilot monitored the approaching storms.

47. One-half mile after passing buoy 12, near buoy 14, the weather had deteriorated so the bow of the ship could not be seen, which indicates visibility was less than 500 feet. Due to the severe and stormy weather, Pilot Lerro took back the conn of the vessel from Atkins and ordered the posting of a lookout and an anchor watch.

48. Maintaining a speed of 13 knots, the SUMMIT VENTURE traveled from buoys 14 to 16, a distance of 1.25 nautical miles, in approximately five minutes. Just prior to reaching buoy 16 at 0721, the vessel's speed was reduced to half ahead or 9½ to 11 knots. When the lookout, Boatswain Sit, arrived on the bow about 0723, he immediately sighted buoy 16 off the port bow as it passed down the port side of the vessel. The boatswain could not clearly see the color or shape of the sighted buoy because of the heavy fog and poor visibility. At that time the rain and wind increased, and visibility was approximately 300 to 500 feet—less than the ship's length. According to the posted maneuvering characteristics, emergency stopping distance of the vessel was in excess of 3,500 feet.

49. Chief Mate Chan testified that he believed the SUMMIT VENTURE should have anchored at buoy 16. The vessel did not anchor, but continued to proceed up Tampa Bay at one-half ahead, even though Lerro could not visually sight the next set of buoys; 1A and 2A. By the time the vessel was two tenths of a mile from buoys 1A and 2A, Atkins advised that the radar scope had been totally obliterated by heavy rainfall and that radar contact was lost. Although radar contact was momentarily regained for one or two sweeps of the port radar, buoys 1A and 2A were never visually sighted or seen again on radar. Even

though the wind had increased no one on the bridge of the SUMMIT VENTURE checked the wind speed or direction indicator. The vessel proceeded forward at one-half ahead at approximately ten knots, toward the critical turning buoy and the bridge, which was less than one mile away.

50. At approximately 0727, Chief Mate Chan left the bridge of the vessel, without waiting for a relief officer, so that Captain Liu was left with the responsibility of two jobs for seven to eight minutes before the collision. Chan failed to inform Captain Liu of the speed or position of the SUMMIT VENTURE or the location of the Skyway Bridge, the navigational buoys or the M/V PURE OIL tanker. As a result, Captain Liu was not sure of the position of his vessel in the channel or the position of the M/V PURE OIL.

51. Notwithstanding radar occlusion and virtually zero visibility, the vessel continued to proceed at 9½ to 11 knots through the turn at buoy 2A, just seven-tenths of a mile away from the bridge. Under these conditions, the vessel required approximately 2500 feet to stop its forward motion. Pilots Lerro, Evans and Atkins, all testified that the vessel was in violation of the speed and visibility rules at this point. At no time did Captain Liu or Chief Mate Chan communicate with the pilot or suggest that the ship be slowed or anchored.

The SUMMIT VENTURE could have successfully anchored at any point from buoy 14 to two tenths of a mile beyond buoy 2A, which Lerro described as the point of no return. Lerro considered turning to port and anchoring, but since the SUMMIT VENTURE failed to maintain radio communications with the M/V PURE OIL, Lerro lacked information about its position. The M/V PURE OIL on the other hand, decided to anchor near buoy 2B at 0726, and therefore, it presented no risk of collision.

52. At 0731, approximately seven-tenths of a mile from the Skyway Bridge and approximately three and one-half minutes prior to the collision, Lerro ordered the engine speed to slow ahead, but that reduction had no appreciable effect on the speed of the SUMMIT VENTURE. Pilot Lerro also ordered standby the anchors, and although the normal complement for the anchor detail is three men, only one man was manning the anchors, and the anchors were not backed out pursuant to Wah Kwong Regulations.

53. At 0732.5, Lerro ordered double full astern, hard aport, and let go both anchors, however only one anchor was dropped. Before any of these emergency measures could take effect, the starboard bow of the SUMMIT VENTURE struck the Skyway Bridge, approximately 800 feet from the center line of the channel, at pier 2S, resulting in the collapse of the bridge and the deaths of 35 people and injuries to one and the loss of one Greyhound bus and several other vehicles. At the time of the collision, the vessel was proceeding at a speed of approximately eight knots. The collision with the bridge occurred at 0734.

## CONCLUSIONS OF LAW

This Court has jurisdiction of the subject matter, in Admiralty and of all the parties and their claims, pursuant to 28 U.S.C. § 1333 and 46 U.S.C. § 185 (1976).

The Court has made detailed findings concerning the events leading up to the collision of the SUMMIT VENTURE with the Sunshine Skyway Bridge on May 9, 1980. To the extent that these findings also constitute legal conclusions they are incorporated herein.

A shipowner may limit his liability for any loss, damage or injury by collision to the amount or value of the owner's interest in the vessel (*i.e.,* the value of the vessel plus pending freight), if "done, occasioned or incurred" without the privity or knowledge of the owner. 46 U.S.C. § 183. The question of whether a shipowner is entitled to limit his liability is answered by a two-step analysis which was articulated in *Farrell Lines, Inc. v. Jones,* 530 F.2d 7 (5th Cir.1976) as follows:

First, the court must determine what acts of negligence or conditions of unseaworthiness caused the accident. Second,

the court must determine whether the shipowner had knowledge or privity of those same acts of negligence or conditions of unseaworthiness.

530 F.2d at 11.

■ Therefore, claimants in this action have the initial burden of proving negligence or unseaworthiness. Upon the satisfying of this prerequisite the burden of proof then shifts to the petitioner for limitation who then bears the burden of proof of lack of privity or knowledge. I quote from the case of *Coleman v. Jahncke Services, Inc.,* 341 F.2d 956, 958 (5th Cir.1965), "The petitioner in limitation, as the prime mover and the party best able to do so, bears the burden of proving lack of privity or knowledge. But the burden of proof of negligence stays with the libelants."

■ Accordingly, the Court must first enumerate the acts of negligence and conditions of unseaworthiness, and then whether or not such findings or combinations were contributing or proximate causes of the allision. The rule of *The Pennsylvania,* 86 U.S. (19 Wall.) 125, 22 L.Ed. 148 (1874), is that the showing of a statutory violation raises a rebuttable presumption of causation. As Judge Brown wrote with respect to the Pennsylvania Rule in the *Board of Commissioners of the Port of New Orleans v. M/V Farmsum,* 574 F.2d 289, 297 (5th Cir.1978), "fault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract."

Therefore, the Court will consider each of the allegations of negligence and unseaworthiness separately, noting that there will necessarily be some overlapping of the two categories.

### Negligence and Unseaworthiness

Each of the allegations of negligence and unseaworthiness will be considered separately.

■ 1. *Ballast*—I have found as a matter of fact that while anchored off the Tampa Bay sea buoy, Captain Liu ordered part of the SUMMIT VENTURE's ballast

discharged, resulting in a change in the draft of the vessel from 14 feet 9 inches forward and 21 feet 6 inches aft to 9 feet forward and 21 feet aft before commencing the transit up the bay toward the Sunshine Skyway Bridge. I conclude as a matter of law that the resulting draft of 9 feet forward and 21 feet aft was reasonable. Captain Rodgers, master of the PURE OIL, and Pilot Schiffmacher, who conned the PURE OIL on May 9, 1980, agreed that this draft and trim was reasonable for a transit out Tampa Bay. There are no regulations which specify the proper drafts and trims for ships entering or exiting Tampa Bay.

■ 2. *Captain Liu's allowing the vessel to be brought up the channel at speeds ranging from half ahead to full ahead* —Captain Liu was negligent in permitting the SUMMIT VENTURE to proceed at full ahead speed until 0721 and at half speed from 0721 to 0731. These speeds were not moderate in view of the visibilities encountered so that the vessel was not in compliance with the Inland Rules and was guilty of a statutory fault calling for the application of the Pennsylvania Rule. The measure of a moderate speed is "a speed such that the vessel can stop in half the distance of visibility."

Article 16 of the Inland Rules, in effect on May 9, 1980, sub-titled "Speed in Fog" provides, "Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions." "Half-distance" is a gloss some courts have added to the statute.

The United States Supreme Court in *Union Oil Co. v. The San Jacinto,* 409 U.S. 140, 93 S.Ct. 368, 34 L.Ed.2d 365 (1972), noted that this is a well recognized gloss which entails the theory that "[i]f two vessels, upon sighting each other, are proceeding at rates of speed such that each can stop before it reaches the point at which the courses of the two intersect, collision is impossible." At 144–45, 93 S.Ct. at 371–372.

The Court further stated the following:

There can be no quarrel with the salutory purpose of this "rule of thumb". It is premised on the notion that when a ship is traveling under foggy weather conditions in waters in which other ships might be proceeding on intersecting courses, the speed of each ship must be such as to enable her to stop within half the distance separating the ships when they first sight each other.

At 145, 93 S.Ct. at 372.

This Court finds as a matter of law that Captain Liu, as master of the SUMMIT VENTURE, was negligent in allowing his vessel to proceed at the speeds ordered by Pilot Lerro under circumstances of visibility less than 500 feet, with an oil tanker possibly proceeding on an intersecting course and a fixed bridge dead ahead.

The SUMMIT VENTURE was not traveling at "a moderate speed" within either the statutory interpretation or court imposed gloss. As such there is a clear violation of 33 U.S.C. § 192, not only was the violation present, but it was also a contributing cause of the allision. Therefore, the burden associated with the Pennsylvania Rule attaches because of the vessel's excessive speed.

■ 3. *Radar interference and the Lack of Radar Observer Certification*—I conclude that the interference between the two radars on the SUMMIT VENTURE when operated together on short range did not in and of itself render the SUMMIT VENTURE unseaworthy. 33 C.F.R. § 164.37(a) requires that a vessel such as the SUMMIT VENTURE must have a second marine radar system capable of operating independently of the first. 33 C.F.R. § 164.37(A) includes a note which provides:

Note: Independent operation means two completely separate systems, from separate branch power supply circuits or distribution panels to antennas, so that failure of any component of one system will not render the other system inoperative.

Thus, this Court finds that there was not a statutory violation. However, the interference between the two radars was a well known fact, and it was negligent of the

owners to allow the ship to proceed to sea without correcting the known problem.

It is clear from the evidence that Captain Liu had little knowledge and inadequate training in the use of the two radar sets aboard the SUMMIT VENTURE. Despite company policy to the contrary, no one on board the SUMMIT VENTURE had a radar observer's certificate. On the morning of the collision, Liu failed to use the radar to its maximum effectiveness—that is, one to track and monitor the approaching weather and the other as an aid to navigation.

■ 4. *The practice of posting a lookout only when requested to do so by pilots* —The Court concludes that the practice on the SUMMIT VENTURE of posting lookouts in harbor only when requested to do so by pilots was a factor in the determination of the seaworthiness of the vessel. Lookouts should have been posted from the moment the ship began the delicate transit into Tampa Bay. At the very least, lookouts should have been posted when the weather began deteriorating. It was negligent of Captain Liu to fail to take the initiative to send a lookout forward. This was not Captain Liu's first visit to the Tampa Bay area. He had sailed under the Skyway Bridge before and should have been aware of the present dangers.

■ 5. *The failure to instruct the lookout to report buoys by type*—The Court concludes that the lookout failed to perform his function appropriately. He took almost ten minutes to reach his position and although he reported the sighting of a buoy, he did not report the color or whether or not he heard any sounds.

There is conflicting testimony as to which side of the ship the buoy passed down. The confusion itself is enough to indicate the inadequacy of the lookout's performance. Before the lookout was ordered forward, he was not told which buoys the ship should be approaching, where the buoys should be located, or what their appearance would be. This is further evidence of the inadequacy of the crew.

■ 6. *The failure of the chief officer to make a full turnover report to Captain Liu before leaving the bridge*—Captain Liu neglected to follow the prescribed procedure when he relieved Chief Mate Chan as officer of the watch. Liu did not know the position or course of the SUMMIT VENTURE or the position of the other vessels in the vicinity and Liu failed to ask Chan for clarifications in this regard. Furthermore, when Chan left the bridge at 0727, no relief officer was present and, thus, Liu had to act in a dual capacity, as master and duty officer on the watch, for seven to eight critical minutes prior to the collision, rendering Liu too busy to monitor the ship's course or ascertain its position.

7. *Captain Liu's relying on the pilots and failing to remonstrate with them*—The testimony of Captain Liu shows clearly that he understood that both the law and the company policy allowed him to discuss areas of concern with the pilots, and that he had the power to overrule or relieve pilots.

The IMCO recommendations which were as a matter of company policy binding on the crew of the SUMMIT VENTURE, provide at section I, paragraph 12, page 6:

Navigation with Pilot Embarked

Despite the duties and obligations of a pilot, his presence on board does not relieve the master or officer in charge of the watch from their duties or obligations for the safety of the ship. The master and pilot shall exchange information regarding navigation procedures, local conditions and the ship's characteristics.

The Manual of Regulations of the Wah Kwong Group, likewise made binding on the SUMMIT VENTURE's crew, provides in part:

11. Pilot

The employment of a pilot, voluntary or compulsory does not absolve the master or his officers of their responsibility in the navigation of the vessel. Too often the common practice of seamen is waived as soon as the pilot embarks. This is wrong.

The Supreme Court in *The China*, 74 U.S. (7 Wall.) 53, 67, 19 L.Ed. 67 (1869) stated:

It is the duty of the master to interfere in cases of the pilot's intoxication or manifest incapacity, in cases of danger which he does not foresee, and in all cases of great necessity. The master has the same power to displace the pilot that he has to remove any subordinate officer of the vessel. He may exercise it, or not, according to his discretion.

■ This was such a case of great necessity with the most blatant negligence on the part of Captain Liu occurring when he allowed his ship to proceed at the hands of the pilot after the master became aware or should have become aware of the ever increasing risk of accident.

While the shipowner, on paper, follows the IMCO rules and recommendations, the actual practice of the company was that all navigational decisions were made by the pilot, when one was aboard and the master could only relieve the pilot if he was acting in a drunken or crazy manner. As Senior Port Captain Chiang put it, the shipowner's policy is that the pilot is "in command" and "in charge." (Chao D–22–25, 36, 51–52, 212; Chiang D–21, 86–87, 98–99, 102–106; Liu D–232, 278–279, 5–7 (5/20/80); Tseng D–73).

In effect, on May 9, 1980, Captain Liu, pursuant to his understanding of the company policy, relinquished to Pilot Lerro his responsibility for the safety of the ship.

■ 8. *The letting go of a single anchor*—For the past 15 years, on entering and leaving port, Liu failed to insure that the anchors were ready for use so that both anchors would be let go in the event it was necessary. This practice violated the Wah Kwong regulations and was contrary to sound navigational practice and good seamanship.

9. *The failure of the SUMMIT VENTURE to sound the whistle*—The evidence shows without dispute that the whistle of the SUMMIT VENTURE was not sounded on the morning of May 9, 1980, prior to the collision with the bridge. It is also undisputed that the visibility distance had been

reduced. Claimants contend that the failure to blow the whistle when visibility was reduced constituted a statutory fault placing upon Hercules Carriers, Inc., under the Pennsylvania Rule, the burden of showing that the omission could not have caused or contributed to the casualty.

The Court finds that the failure to sound the whistle signals was a violation of the Inland Rules. The purpose of the rule violated, however, is to warn ships on intersecting paths, not vehicles on bridges or bridges themselves. There is argument that the signals would have prompted the PURE OIL's return signals and thus guided Lerro's decision on the question of whether to turn aport and anchor. The Court finds that while this argument is not meritless, it is tenuous. Therefore, the Court finds that there is not sufficient causal connection between the whistle signal violation and the allision to bring the Pennsylvania Rule into operation with respect to this rule. *See Board of Commissioners of New Orleans v. M/V Farmsum, supra.*

10. *The failure to have on board the SUMMIT VENTURE a copy of Coast Guard Pamphlet CG–169*—It was established at trial that a copy of Coast Guard pamphlet CG–169 was not on board the SUMMIT VENTURE on May 9, 1980. 33 C.F.R. § 93.13(b) requires ships operating on the inland waters of the United States to carry a copy of Coast Guard pamphlet CG–169 containing the United States Inland Navigation Rules. After Captain Liu had been excused as a witness, it was stipulated to by the parties that had he been asked he would have testified that there was a copy of the 1970 edition of the British Admiralty Publication *East Coasts of Central America and Gulf of Mexico Pilot* on board the SUMMIT VENTURE on the date of the accident. The British publication included the United States Inland Navigation Rules. 33 C.F.R. § 93.13(b) must be read together with 33 C.F.R. § 164.33(b) which provides in relevant part as follows:

(b) A vessel may have a chart or publication published by a foreign government instead of a chart or publication required by this section if the chart or publication contains similar information to the U.S. Government publication or chart.

It is clear that the federal regulations are intended to require that certain "information" is available to those navigating the vessel. The publication in which the "information" is found is not critical. The information contained in Coast Guard pamphlet CG–169 was available on the SUMMIT VENTURE on May 9, 1980. Therefore, I conclude as a matter of law that neither the SUMMIT VENTURE nor her owners were in violation of 33 C.F.R. § 93.13(b).

11. *The overall performance of Wah Kwong Shipping Agency Company as manager and operator of the SUMMIT VENTURE*—Death and injury claimants contend that the voyage upon which the SUMMIT VENTURE was engaged at the time of the collision commenced on the morning of May 9, 1980, when she departed the anchorage off the Tampa Bay sea buoy for the trip into Tampa Bay. The purpose of this contention is to lay a predicate for the application of 46 U.S.C. § 183(e) which provides:

(e) In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel.

The shipowner contends the voyage commenced when the SUMMIT VENTURE completed discharge of her outbound cargo at Houston. The Court agrees with this assertion, evidence having been presented at trial to show that that was when she went on hire with Yamashita Shinnihon Lines.

12. *Crew training and Wah Kwong information*—Captain Liu failed to instruct or train the crew of the SUMMIT VENTURE and failed to disseminate to them critical company and navigational information. According to Liu's own admission, he had never shown the Wah Kwong regulations or

the IMCO rules to his deck officers before the collision, nor did he inquire whether any of his mates read or periodically reviewed these regulations. Consequently, Chief Mate Chan never had the Wah Kwong policies and binding regulations outlined or explained to him. Chief Mate Chan failed to exercise his authority over the pilot when the ship was in obvious danger because he was unsure of his authority as between the master and the pilot. Although Chan believed that the SUMMIT VENTURE should have been stopped and anchored in the vicinity of buoy 16 due to visibility problems, Chan did not realize that he had the power or the authority or the duty to do so. However, the IMCO rules and the shipowner's manual clearly so provided. Chan had never read or reviewed these publications prior to May 9, 1980.

▪ 13. *Validation of the licenses of the chief officer and second officer*—The chief officer and second officer of the SUMMIT VENTURE did not have valid Liberian licenses on May 9, 1980, because the Chinese licenses which they presented in order to obtain their Liberian licenses could not be validated. S.K.T. Chu testified that Wah Kwong Shipping Agency Company took those Chinese licenses at face value. In the circumstances, the Court finds this totally unreasonable. It is inexcusable for a company which operates ocean going vessels in all waters to have its vessels manned with unlicensed senior officers, regardless of their competency.

## UNSEAWORTHINESS

▪ The claimants contend that petitioner is not entitled to limitation because the SUMMIT VENTURE was unseaworthy on May 9, 1980, due to an inadequate and unlicensed crew. A shipowner has a nondelegable duty to provide a competent master and crew and to insure that its vessel is seaworthy so that any loss occurring by reason of fault or neglect in these particulars is within the privity and knowledge of the shipowner. *Tug Ocean Prince, Inc. v. United States,* 584 F.2d 1151 (2d Cir.1978), *cert. denied,* 440 U.S. 959, 99 S.Ct. 1499, 59

L.Ed.2d 772 (1979). Unseaworthiness may be caused by the insufficient manning of the vessel or an incompetent crew. *Horn v. C/A Navegacion Fruco,* 404 F.2d 422 (5th Cir.1968), *cert. denied,* 394 U.S. 943, 89 S.Ct. 1272, 22 L.Ed.2d 477 (1969).

▪ The evidence shows that the shipowner failed to man the SUMMIT VENTURE with a competent crew, especially in the following particulars:

(a) The master and the crew consistently violated the Inland rules of the road, Wah Kwong regulations and the IMCO rules regarding speed in restricted visibility. *In re Delphinus Maritima,* 523 F.Supp. 583, 593 n. 1 (SDNY 1981) (a vessel may be rendered unseaworthy, not only by a physical condition, but by an incompetent navigational practice).

(b) The master thought it was appropriate to navigate a vessel solely by reference to radar in restricted or zero visibility. *Getty Oil Co. v. SS Ponce De Leon,* 409 F.Supp. 909 (SDNY 1976), *aff'd,* 555 F.2d 328 (2d Cir.1977) (functioning radar does not relieve a vessel of the moderate speed requirement).

(c) The master thought a lookout was not needed in zero visibility as long as the radar was on and operating.

(d) Shipowner does not require its captains to post a lookout in harbor areas unless the pilot asks for one, even in reduced visibility. *St. Philip Offshore Towing Co. v. Wisconsin Barge Lines, Inc.,* 466 F.Supp. 403 (E.D.La.1979) (vessel proceeding through fog has a duty to post a proper lookout, and this duty cannot be fulfilled by a person who has other duties).

(e) The lookouts, Sit and Lok, received no instructions from the watch officer, prior to going on watch concerning what to look for or what to expect during the voyage up Tampa Bay, a clear violation of the IMCO regulations. (Ex. 33 § 27).

(f) The lookout assigned on the SUMMIT VENTURE had divided duties on the morning of the subject collision in that he was also required to man the anchors. *Harbor Towing Corp. v. Tug Reliance,* 211 F.Supp.

896 (ED Va.1963) (duty of posting a diligent lookout who has no other duties is one of the strictest rules in admiralty); *Complaint of Flota Mercante Grancolombiana,* 440 F.Supp. 704 (SDNY), *aff'd,* 573 F.2d 1290 (2d Cir.1977) (same); *Moran Towing & Transportation Co. v. United States,* 80 F.Supp. 623, 631 (SDNY 1948) (divided duties make one an insufficient lookout).

(g) Chief Mate Chan and Captain Liu did not realize that when a vessel is being piloted by a compulsory pilot, the master and officers of the vessel are not relieved of their ultimate responsibility to ensure that the vessel is properly navigated without the danger to herself or others in the marine environment. *Charente SS Co. v. United States,* 12 F.2d 412 (5th Cir.1926). Consequently, although Chan thought the SUMMIT VENTURE should have been anchored at Buoy 16 on the morning of May 9, 1980, due to poor visibility, Chan did not think he had the authority to discuss anchoring with the pilot and, in fact, anchor, if his discussion with the pilot led him to conclude that the ship was proceeding in a dangerous situation.

(h) Captain Liu failed to discuss or question Lerro regarding navigation of the SUMMIT VENTURE, even though he had been concerned about the safety of his vessel for approximately ten minutes before the collision. *Chesapeake Bay Bridge and Tunnel District v. Lauritzen,* 404 F.2d 1001 (4th Cir.1968) (shipowner is responsible if the master fails to correct endangering movements of the ship, even when a statutory pilot is ostensibly the steersman).

(i) The normal practice on the SUMMIT VENTURE is to enter port without an anchor watch and without placing the anchors in a condition for immediate release, contrary to the Wah Kwong regulations. (Ex. 44 § 15).

(j) Although Pilot Lerro requested that both anchors on the SUMMIT VENTURE be ready to drop, and three men were required to drop both anchors simultaneously, only two men were on the bow and, thus, only one anchor was dropped when the pilot's order came to drop both anchors. The testimony shows that the starboard anchor still had a stopper on it and, thus, it was not in the condition required by the Wah Kwong regulations. (Ex. 44, p. 16, § 15).

The aforementioned list of deficiencies justifies a finding that the crew of the SUMMIT VENTURE was incompetent on the morning of May 9, 1980, and accordingly, Hercules' petition for limitation of liability should be denied.

## PRIVITY AND KNOWLEDGE

■ The above enumerated acts of negligence and conditions of unseaworthiness clearly establish that claimants have met their burden of proof. Shipowner concedes that a rebuttable presumption of fault arose when the SUMMIT VENTURE allided with the Skyway Bridge. (See Appendix B) *The Oregon,* 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943 (1895). Furthermore, Judge Carr's partial summary judgment on the issue of exoneration concluded that a legal cause of the collision was the negligence of Lerro and the weather was a condition and not a legal cause of the collision. Although not called upon to do so, the Court notes that after hearing all the facts, the conclusion reached by Judge Carr respecting the negligence of Pilot Lerro is inescapably correct.

The second element in determining whether petitioner is entitled to limitation is whether the shipowner had knowledge or privity of the specific acts of negligence or conditions of unseaworthiness which caused the loss. Petitioner admits that in the context of a corporation, "privity and knowledge" means the privity and knowledge of a managing agent, officer or supervising employee, including supervisory shoreside personnel, and that the privity and knowledge of Wah Kwong is the privity and knowledge of Hercules. (Pre-trial Stipulation ¶ 6A), *Continental Oil Co. v. Bonanza Corp.,* 677 F.2d 455 (5th Cir.1982); *China Union Lines, Ltd. v. A.O. Andersen & Co.,* 364 F.2d 769 (5th Cir.1966) *cert. denied,* 386 U.S. 933, 87 S.Ct. 955, 17 L.Ed.2d 805 (1967). In determining the issues of privity and knowledge, petitioner has admitted that the

shipowner has the burden of proof in establishing a lack of privity and knowledge on its part. (Pre-trial Stipulation ¶ 7A).

It is beneficial to recognize that limited liability is not favored under the law. The development of the corporate form of business and the universal use of insurance has undercut the underlying historical basis of the limitation act. *Continental Oil Co. v. Bonanza Corp., supra.* The act was originally modeled after English law to equalize American shipping with that of the British. In 1894, the Court in *The Main v. Williams,* 152 U.S. 122, 14 S.Ct. 486, 38 L.Ed. 381 (1894) noted that the Limitation Act and in fact, any public policy statute which bordered on injustice should be strictly construed. The Court further stated the following:

> While from the universal habit of insuring vessels, the application of the statute probably results but rarely in an actual injustice to the owner of the injured vessel, yet, being in derogation of the common law, we think the court should not limit the right of the injured party to a recovery beyond what is necessary to effectuate the purposes of Congress.

152 U.S. at 132, 14 S.Ct. at 488.

Furthermore, nearly thirty years ago Justice Black addressed the injustice which Congress created by the Limitation of Liability Act.

> Judicial expansion of the Limited Liability Act at this date seems especially inappropriate. Many of the conditions in the shipping industry which induced the 1851 Congress to pass the Act no longer prevail, and later Congresses, when they wished to aid shipping, provided subsidies paid out of the public treasury rather than subsidies paid by injured persons.

*Maryland Casualty Co. v. Cushing,* 347 U.S. 409, 437, 74 S.Ct. 608, 623, 98 L.Ed. 806 (1954).

The Limitation of Liability Act is an antiquated statute. It is time for Congress to take the wheel and re-examine the policies which led to the legislation. Granted there is little or no actual injustice when the statute is applied to a purely maritime case such as a collision between vessels. But how can a motorist who is unfamiliar with the maritime industry, customs, and law, insure him or herself against the risk of such a tragic encounter?

■ The petitioner argues that the accident in question was inevitable, but this doctrine has no application where the accident is caused by a lack of nautical skill. *Charente S.S. Co. v. United States,* 12 F.2d 412 (5th Cir.1926). The master is responsible for the safety of his ship and even when a pilot is at the wheel, the master should assert his authority for the safety of his ship "where it is obvious or apparent that danger from some cause is imminent, though the particular cause of danger may not be appreciated." *Id.* at 413. It was unnecessary that Captain Liu have contemplated the danger of pilot error, "but it was sufficient that the danger of the situation from any one of a number of probable causes was reasonably apparent, to make it the duty of the master to insist upon the adoption of a method that was safe and ready at hand." *Id.*

■ The defense of inevitable accident is not available when those in charge of the navigation of the vessel have, through their negligent and imprudent seamanship, placed the vessel in a dangerous circumstance where it is too late to avoid the accident. *Petition of Canal Barge Co. v. Griffith,* 480 F.2d 11 (5th Cir.1973). As aptly stated by Judge Learned Hand, "it must always be remembered that it is the risk of collision, not the collision itself, that the master must avoid." *Ocean SS Co. v. United States,* 38 F.2d 782, 784 (2d Cir. 1930).

■ The shipowner's defense of inevitable accident is without merit and is rejected, particularly in view of the conclusion that the shipowner's practices and procedures constituted negligence and were a proximate cause of the subject collision.

■ The record supports the conclusion that the shipowner's policy of placing the pilot, as opposed to the master, in command

of the vessel proximately contributed to the subject collision. Samuel Chu, executive director and secretary of Wah Kwong, stated that Wah Kwong found Lerro at fault for failing to slow or stop the SUMMIT VENTURE when Lerro no longer knew the precise position of the vessel. Judge Carr also found Lerro negligent for failing to stop and drop anchor in the area of buoy 16 in his partial summary judgment order of July 2, 1982. *See* Appendix C. Captain Liu failed to discuss or question Lerro in this regard. If Liu had complied with his duty to ensure the safe navigation of the vessel and anchored at buoy 16 or at buoys 1A and 2A, or had proceeded to slow or dead slow ahead at buoy 16 as required by the rules for the prevention of collision, the collision would have been prevented. (Lerro 405–407).

Chief Mate Chan, the watch officer, also failed to discuss or question the pilot even though he recognized the perilous situation and wanted to anchor at buoy 16; but because Chan was unaware of his obligation to discuss the situation with the pilot, nothing was done. Both the master and the chief mate were in a position to see and to know everything Pilot Lerro did pertaining to weather, rain, visibility, wind, buoys, speed and the approach of the Skyway Bridge. The Court finds that Captain Liu's and Chief Mate Chan's imprudent and unreasonable inaction contributed to the collision between the SUMMIT VENTURE and the Skyway Bridge.

Further, the evidence shows, and I so find, that petitioner has failed to demonstrate that the company's policy whereby the pilot, rather than the master, was in ultimate command of the vessel was without its privity and knowledge. Port Captain Chaing, a former master and current managerial officer of Wah Kwong, testified that according to shipowner's policy, the pilot was not merely an advisor, but was, in fact, in command of the ship. Clearly, Captain Liu's and Chief Mate Chan's conduct on May 9, 1980, was confirmation of this company policy. In addition, it was Port Captain Chaing's responsibility to insure that the IMCO regulations, which by his own admission are binding on the SUMMIT VENTURE, are being followed. The IMCO rules provide that a pilot's presence on board a vessel does not relieve the master or watch officer of their duties and obligations.

Petitioner also failed to meet its burden in proving that it was without privity and knowledge of the fact that the chief mate and the second mate held fraudulent licenses. Despite the fact that a shipowner has a non-delegable duty to provide a competent crew, shipowner had a practice of not checking the licenses of long-term employees. More importantly, Wah Kwong was on notice as of August 25, 1977, that there was a potential problem with fraudulent licenses in its fleet, but S.Y. Chow, Wah Kwong's executive officer in charge of licenses, still did virtually nothing to ascertain the validity of Chief Mate Chan's or Second Mate Sun's licenses. Privity and knowledge does not require actual knowledge—it is deemed to exist where the shipowner could have obtained the information by reasonable and prudent inspection. *China Union Lines, Ltd. v. A.O. Andersen & Co., supra. See Great Atlantic & Pacific Tea Co. v. Brasileiro,* 159 F.2d 661 (2d Cir. 1947).

The evidence adduced supports the conclusion that shipowner's failure to provide an adequate training program for the masters, deck officers and the lookout substantially and proximately contributed to the catastrophe on May 9, 1980. Due to a total lack of training, unlicensed Chief Mate Chan was uninformed as to basic navigational practice, the rules of the road, IMCO regulations, and his duties as officer of the watch. As a result, Chan, (1) failed to post a properly informed and diligent lookout who had no other duties; (2) left the bridge of the vessel without a relief officer and without informing Captain Liu of the position and speed of the SUMMIT VENTURE, or the position of the PURE OIL tanker; (3) improperly failed to plot or reaffirm the position of the SUMMIT VENTURE on May 9, 1980; (4) did not insure the safe

navigation of the SUMMIT VENTURE by requiring compliance with the rules of the road in restricted visibility; (5) neglected to inquire or intervene when it was apparent that Pilot Lerro was placing the SUMMIT VENTURE in a position of peril. These deficiencies clearly contributed to the faulty navigation of the SUMMIT VENTURE on May 9, 1980, to the corresponding damage to the bridge and to the deaths and the personal injuries arising therefrom.

Petitioner contends that since the purpose of the limitations statute is to entitle a shipowner to rely upon its crew in a "judgment call" situation, a finding of privity and knowledge is not justified in the present case since all the errors by the crew of the SUMMIT VENTURE were "errors in navigation." Petitioner's logic is faulty in that it overlooks the fact that before limitation can be granted, the shipowner must show that it has complied with its duty to provide a competent crew which is properly trained and instructed in its duties. With respect to this issue the Court adopts the policy and reasoning of the United States District Court for the Eastern District of Louisiana.

> The actual conduct of such an incompetent crew which is the cause of the damage may involve the navigation or management of the vessel; nonetheless if incompetence results in a navigational error which causes the collision, it is crew incompetence, and therefore the unseaworthiness of the vessel, which has caused the ... damage. The fact that the unseaworthiness can be labeled as an error in navigation does not magically protect the shipowner from liability. At some point along a spectrum of performance competency, an error in navigation is attributable to incompetence on the part of the crew.

*Matter of Ta Chi Navigation (Panama) Corp., S.A.*, 513 F.Supp. 148, 158 (E.D.La. 1981).

The shipowner, (1) never offered any training programs of any type to any of its crew; (2) never outlined the duties of chief mate to Chan; and (3) failed to inquire into the validity of the licenses of its employees who had been employed by the company in any capacity for a long time. Consequently, I find that Hercules has failed to prove absence of privity and knowledge since the fault in the above mentioned particulars is directly attributable to the petitioner by its failure to exercise due diligence in selecting, training and maintaining a competent crew.

Petitioner did not meet its burden of disproving that privity and knowledge existed concerning Captain Liu's and Chief Mate Chan's failure to have radar observer's certificates and adequate radar training. Port Captain Li testified that Wah Kwong's company policy required that its deck officers have radar certification, and since Li was in charge of training and could have made simple inquiry in this regard, I find that Li either knew or should have known the status of Liu's and Chan's radar training. Liu's failure to implement a program which insured that the deck officers had radar training and certification cannot bootstrap a finding of the absence of privity and knowledge on the part of petitioner especially when K.T. Chu testified that at least two people should have radar certificates.

Petitioner failed to have a follow-up procedure which insured that its instructions, the rules of the road, the IMCO regulations and the Wah Kwong rules were being read and complied with by its crew. This neglect produced and perpetuated several improper navigational practices, including consistent violations of the moderate speed rule. 33 U.S.C. § 192. Captain Liu admitted that it was common practice for shipowner's vessels to navigate in restricted area with zero visibility solely by reference to radar and, further, that the company knew of this practice since it had access to the log books where such matters are recorded. Obviously, this practice is clearly in violation of the moderate speed requirement, a rule designed to prevent collisions at sea, which has been interpreted to require that a vessel use such precautions as would enable it to stop within one half the

distance of its visibility. In the present case the SUMMIT VENTURE was proceeding at 9½–11 knots for 5 to 6 minutes after being overtaken by a rain shower which gradually grew so intense that it reduced visibility below 500 feet. This constitutes a clear violation of the moderate speed rule and although there are exceptions to the rule, none have been shown under the facts of this case since steerageway could be maintained at slow ahead and the vessel could have safely anchored until just past buoy 2A. This violation makes it incumbent on the shipowner, under the *Pennsylvania* rule to show not only that its failure to proceed at a moderate rate of speed did not cause or contribute to the collision, but that it could not have. Under the circumstances, the Court feels that the shipowner has not met this burden. To the contrary, I find that had the SUMMIT VENTURE proceeded at a moderate speed, the vessel would have had more time to apprehend the danger and react to the weather and the collision could possibly have been averted.

■ The SUMMIT VENTURE's practice of not posting a lookout as long as radar was on and operating and the failure to give the lookouts training or instructions as to their duties, also contributed to the collision. The evidence in this case shows that the lookout was left uninformed as to his responsibilities, did not know what he was looking out for, and had the additional duty of manning the anchors. The duty of posting a diligent lookout who has no other duties is one of the strictest rules of admiralty. Had a proper lookout been posted, perhaps the location of the Skyway Bridge and the position of navigational buoys would have been perceived, reported and action could have been taken sooner to avoid a collision. Certainly the deterioration of the weather and the reduction of visibility could have been reported as it occurred. This statutory fault calls for application of the rule of *The Pennsylvania,* a rule which once again the shipowner has failed to satisfy. *First National Bank of Chicago v. Material Service Corp.,* 544 F.2d 911 (7th Cir.1976).

■ Petitioner's failure to follow-up on the SUMMIT VENTURE's compliance with the aforementioned rules and regulations also precludes a finding that petitioner has proved the absence of privity and knowledge. The mere fact that a vessel owner gives instructions to its crew is insufficient to prove the lack of privity and knowledge since a shipowner has a duty to insure that its directives are being followed by making inspection and inquiry. *Spencer Kellogg & Sons, Inc. v. Hicks,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932); *Avera v. Florida Towing Corp.,* 322 F.2d 155 (5th Cir.1963). The fact that the company had access to the SUMMIT VENTURE's log books (where several improper navigational practices regarding speed and the posting of lookouts were revealed), strongly justifies a finding of privity and knowledge.

Claimants also proved that petitioner's failure to disseminate the informational material, including IMCO regulations, the Wah Kwong rules, and the radar instructions in a language which the officers and the crew of the SUMMIT VENTURE could read and comprehend diminished the crew's opportunity to become properly apprised of their duties.

■ The Court finds as a matter of fact and law that the Wah Kwong Agency was negligent in its supplying the SUMMIT VENTURE with English versions of the required rules and regulations without securing knowledge that its crew could read and understand English proficiently. The requisite manuals are to be placed on board for more than mere decoration. It is not the act of placing the volumes onboard which satisfies the statute, but rather the act of supplying the needed navigational material and this supplying necessarily includes the communication of said information to the officers and crew.

In accordance with the foregoing, petitioner has not overcome the presumption of fault which arises when a vessel collides with a stationary object. In view of the foregoing, I conclude that the absence of effective access to the IMCO regulations and the Wah Kwong rules was a contribu-

ting cause of the Skyway Bridge collision since the crew of the SUMMIT VENTURE was not competently informed as to fundamental navigational practices.

## CONCLUSION

■ Having brought this action, the initial burden is on Hercules to show no fault on its part or if there was fault, that the fault was without personal knowledge. *Tug Ocean Prince, Inc. v. U.S.,* 584 F.2d 1151, 1155 (2d Cir.1978), *cert. den.,* 440 U.S. 959, 99 S.Ct. 1499, 59 L.Ed.2d 772 (1979). The collision of the SUMMIT VENTURE with the Skyway Bridge probably did not occur because of a single separate incident. "It was the result of an accumulation of acts, all of which originated with [the shipowner's] management, resulting in an easily foreseeable casualty." *Tug Ocean Prince, Inc. v. U.S., supra.* Where a vessel owner by its prior action or inaction sets into motion a chain of circumstances which may be a contributing cause even though not the immediate proximate cause of the casualty, the right to limitation is properly denied. *Id.*

■ Hercules failed to use due diligence to make the vessel seaworthy in that it had an incompetent crew which existed before the commencement of the voyage in question and that this unseaworthiness was with the owner's privity and knowledge. As stated in *Tug Ocean Prince, Inc. v. U.S., supra,* "it is the owner's duty to use due and proper care to provide a competent master and crew and to see that the ship is seaworthy; any loss occurring by reason of fault or neglect in these particulars is within his privity." Unquestionably, the ship was improperly manned. The ship's officers consistently violated many of the rules of the road which had been known for years by management, all of which was negligence and many of which were a contributing cause of the tragedy. The burden was therefore on Hercules to show that these faults were without personal knowledge or in other words, without privity. This burden Hercules has failed to carry.

As stated in *Orient Mid East Lines, Inc. v. A Shipment of Rice, etc.,* 496 F.2d 1032 (5th Cir.1974), that it is possible that incompetence of one or more crew members might not standing alone have a sufficient adverse consequence, however, combined, they amount to an inadequate crew and an unseaworthy condition.

Traditionally, the Captain of a ship is liable for its deeds and misdeeds as well as those of its crew. I find that Lerro was guilty of negligence and indeed gross negligence, which was the proximate cause of the casualty. The reasoning requiring a compulsory pilot in certain waters is sound. Certainly, a person familiar with the waters in question should be better able to pilot a ship in those waters than one who is not familiar with them, regardless of his experience and competency. The fact that a compulsory pilot is aboard and in charge of conning a ship does not relieve the skipper of his responsibilities. Captain Liu did not fulfill his responsibilities when he permitted Lerro to place the ship in a position from which there was no escaping a tragedy. It is argued by the petitioner that the sole cause was error in navigation. This argument overlooks the fact that the errors in navigation occurred after the ship had negligently been permitted to be in an extremist situation.

It is evident from what heretofore has been said, that the vessel owner in this case is not entitled to limitation under 46 U.S.C. § 183.

APPENDIX A

## APPENDIX B

### PERTINENT SECTIONS OF PRETRIAL STIPULATION

.    .    .    .    .

3. Hercules Carriers, Inc., the plaintiff for limitation, contends that it is entitled to exoneration from liability (recognizing that exoneration was denied by partial summary judgment, which is on appeal), or in the alternative, limitation of its liability to the value of its interest in the vessel, and to recover on its counterclaims against the State of Florida Department of Transportation [hereafter DOT] and Greyhound and its third party claims against the United States (claimants and third party defendant contend counterclaims and third party claims should not be tried at the same time as the limitation of liability action set for October 12, 1982).

The DOT contends that Hercules is not entitled to limit its liability pursuant to 46 U.S.C. § 183 *et seq.* and is not entitled to recover under its counterclaim against the DOT whenever such issue is tried.

The death and injury claimants contend that Hercules is not entitled to limitation of liability under 46 U.S.C. § 183 *et seq.*

Greyhound contends that Hercules is not entitled to limitation of liability under 46 U.S.C. § 183 and is not entitled to recover under its counterclaim against Greyhound whenever such issue is tried.

The United States contends that Hercules is not entitled to limitation of liability under 46 U.S.C. § 183 and is not entitled to succeed on its third party claims against the United States whenever such issue is tried. Claimants contend the United States is not a proper party to the suit for limitation.

.    .    .    .    .

7. There is agreement amongst the parties with respect to the following principles of law:

A. Hercules Carriers, Inc., as plaintiff, has the burden of proof of entitlement to limitation of liability.

B. There is a rebuttable presumption of fault when a vessel allides with a bridge.

C. The Inland Rules and Pilot Rules of the United States were in force at all material times.

8. The following issues of fact remain to be litigated:

A. Whether the accident and damages were done, occasioned or incurred without the privity and knowledge of Hercules Carriers, Inc.

B. Whether the accident was caused by an act of God. (Claimants contend this issue was decided by the partial summary judgment denying exoneration.)

C. Whether the SUMMIT VENTURE was unseaworthy and if so, whether such unseaworthiness was a cause of the accident.

D. Whether the crew of the SUMMIT VENTURE was negligent and if so, whether such negligence was a cause of the accident.

E. Whether the master of the SUMMIT VENTURE was negligent and if so, whether such negligence was a cause of the accident.

F. Whether Hercules Carriers, Inc. was negligent in the training of the crew or master, the disseminating of information to the crew or master, the making of policies with respect to the operation of the ship, and failure to enforce compliance with its regulations, and if so, whether such negligence was a cause of the accident.

G. Whether the DOT was negligent with respect to the design, construction or maintenance of the Sunshine Skyway Bridge and if so, whether such negligence was a cause of the accident.

H. Whether Greyhound was negligent with respect to the operation of its bus, and if so, whether such negligence was a cause of the accident.

I. Whether the United States was negligent with respect to:

i. The failure to promulgate warnings of the storm which the SUMMIT VENTURE encountered in the vicinity of the bridge on the day of the accident.

ii. The establishment of requirements for the lighting and marking of the bridge and its approaches as an obstruction to navigation.

iii. The failure to prescribe regulations with respect to traffic meeting in the vicinity of the bridge.

iv. The failure to prescribe minimum visibility conditions under which a vessel might undertake to approach and transit the bridge.

v. The failure to prescribe minimum draft and trim standards for a vessel undertaking to approach and transit the bridge.

vi. The failure of the Corp of Engineers to design the channel approaching the bridge so as to avoid a turn seven-tenths of a mile before the bridge, and

With respect to all of the foregoing whether, if so, such negligence was a cause of the accident.

J. What is the effect of IMOCO Rules in this case.

9. The following issues of law remain for determination by the Court.

A. Whether Hercules Carriers, Inc. is entitled to limitation of liability to the value of its interest in the SUMMIT VENTURE.

B. Whether the DOT is liable to Hercules Carriers under its counterclaims. * * *

C. Whether Greyhound is liable to Hercules Carriers under its counterclaims. * *

D. Whether the United States is liable to Hercules Carriers under its third party claims. * * *

E. * * * See paragraphs 3 and 11.

## APPENDIX C

## PARTIAL SUMMARY JUDGMENT

On May 9, 1980, the M/V Summit Venture collided with the Skyway Bridge.

Shortly thereafter, Hercules Carriers, the owner of the Summit Venture, filed a complaint pursuant to 46 U.S.C. § 183 *et seq.* for exoneration from fault or for limitation of its liability with respect to the collision. The Steering Committee and the State of Florida's Department of Transportation have filed motions for Partial Summary Judgment on the issue of exoneration from liability.[1] The Court heard argument on September 25, 1981 and April 27, 1982.

### I

Summary judgment is authorized if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The Court of Appeals has repeatedly stressed that the rule is to be invoked cautiously so that parties may always be afforded a trial whenever there is a bona fide dispute of fact. *Diplomat Electric, Inc. v. Westinghouse Electric Supply Co.,* 378 F.2d 377, 386 (5th Cir.1967). Accordingly, "summary judgment is proper only 'when the truth is clear, where the basic facts are undisputed and the parties are not in disagreement regarding material factual inferences that may be properly drawn from such facts.'" *Crystal City v. Del Monte Corp.,* 463 F.2[d] 976, 981 (5th Cir.1972), *cert. denied,* 409 U.S. 1023 [93 S.Ct. 464, 34 L.Ed.2d 315]. "In essence, summary judgment is reserved for the situation where the moving party has established his right to judgment with such clarity that the non-moving party cannot recover under any discernible circumstance." *Heller v. Namer,* 666 F.2d 905 (5th Cir.1982).

### II

The only issue before the Court is whether John Lerro, the compulsory pilot aboard the M/V Summit Venture, was in any way at fault for the vessel's collision with the Skyway Bridge. If Lerro was in any way

1. Hercules Carriers contends that the State of Florida is collaterally estopped from asserting Pilot Lerro's negligence because of the findings of the State's Department of Professional Regulation. The Court heard argument on April 27, 1982 on the collateral estoppel issue and the motion is now under advisement. Therefore, this Court's opinion granting Partial Summary Judgment on Exoneration does not, at this time, apply to the State of Florida.

at fault, the M/V Summit Venture would be liable *in rem* and Hercules Carriers would not be entitled to exoneration. *THE CHINA* 74 U.S. (7 Wall.) 53 [19 L.Ed. 67] (1868); *Little v. AldaCosta (M/V ADLOS)*, 544 F.2d 752, 755 (5th Cir.1977); *California v. Italian Motorship ILICE*, 534 F.2d 836 (9th Cir.1976). In order to prevail on this partial Motion for Summary Judgment, the Steering Committee must demonstrate that the undisputed facts lead to a finding of negligence and that no other conclusion could be reached by the Court.

To establish negligence, the Steering Committee claims that Pilot Lerro made a number of crucial navigating errors as the weather deteriorated on Tampa Bay the morning of May 9, 1980. The Committee directs the Court's attention to Lerro's failure to reduce speed and anchor once visibility was reduced. Hercules Carriers argues that the onset of a sudden storm of high intensity was the legal and proximate cause of the accident and that Lerro's navigating decisions were reasonable in light of the onset of the sudden storm.

### III

In an admiralty context, the legal "proximate" cause of a casualty is "that cause which in a direct, unbroken sequence produces the injuries complained of and without such injury would not have happened." *Olympia Towing Corporation v. Nebel Towing Co.*, 419 F.2d 230 (5th Cir.1969). In order to be exonerated from liability, Hercules Carriers must prove the storm of so overwhelming a character that it produced the injury independently of Lerro's negligence. *See* 65 C.J.S., *Negligence* §§ 111(4)–111(5). In other words, the storm must be the sole cause of the collision. However, if Lerro's negligence concurred with the storm or so directly contributed to the collision that it is reasonably certain that the storm alone would not have produced the collision, Hercules would be liable.

The Court has considered all of the motions and memoranda filed by the parties, the arguments of counsel, the applicable law and has reviewed the deposition testimony of Captain Lerro, the crew members of the Summit Venture and various pilots aboard other vessels on the bay the morning of May 9, 1980. After reviewing these materials, this Court concludes that the undisputed, indeed the admitted facts, from Captain Lerro and the officers and crew of the Summit Venture, clearly demonstrate that the legal cause of the collision was the negligence of Pilot Lerro and that the weather, if it is to be considered at all, was a condition and not a legal cause of the collision. This Court is convinced that no other conclusion could be drawn from these undisputed facts and Hercules Carriers would not be entitled to exoneration under any discernible circumstance.

There is unanimity among all the witnesses that the Summit Venture entered Mullet Key Channel at approximately 0715 hours on May 9, 1980. The vessel was on an eastward course toward the Skyway Bridge at full speed ahead. There was some light rain. From 0715 hours onward, the rain increased in intensity but was intermittent. At 0721 hours, the vessel was reduced to half speed or between 9 and 10 knots. At 0723 hours, as the Summit Venture was passing channel marker # 16, the rain became extremely intense and visibility was reduced by wind and rain to 500 feet or less. At this time, visual contact was lost with the next set of buoys and the upcoming bridge. Despite the reduction in visibility, Lerro continued to steer the Summit Venture on an eastward course toward the bridge at a speed of 9 to 10 knots and collided with the bridge approximately ten minutes later.

Lerro himself admits: (1) when visual visibility is reduced below one-mile (approximately 2600 feet) a vessel should be anchored; (2) that the moderate speed rule dictates that the speed of the vessel in restricted visibility should be reduced so that the vessel can be stopped in one-half the distance of her visibility; and (3) navigating solely by reference to radar is improper. *See* Deposition of John Lerro, pgs. 369–370, 129–130, 346–347, respectively.

By buoy # 16 all conditions were met which, even by Lerro's own admissions, dictated that the vessel should have been anchored. This opinion was fully concurred with by the Chief Mate of the Summit Venture, who was on the bridge at the time. *See* Deposition of Chan Csin Yee, pgs. 65–66.

Even if the Court assumes that the weather greatly deteriorated past buoy # 16 and subsequently developed into a storm of high intensity, the weather was merely a condition that compounded Lerro's negligence in failing to stop and anchor in the area of buoy # 16. No real dangers existed or were inherent in the weather itself, the weather merely set the stage for Lerro's original negligence to come into play; the weather was not a legal proximate cause but at best a remote cause or condition. The undisputed material facts lead to the inevitable conclusion that once visibility was reduced to 500 feet or less and visual contact had been lost with the bridge and the next set of buoys, Lerro should have dropped anchor in the vicinity of buoy # 16 avoiding this disaster. His failure to drop anchor near buoy # 16 was active negligence. Whatever happened from that point on was the direct and proximate result of Lerro's failure to anchor and lead directly and in an unbroken sequence of events to the tragic collision which occurred some ten minutes later.

Accordingly, Lerro's negligence was a major contributing cause of this disaster and Hercules Carriers is therefore DENIED exoneration from liability.

DONE AND ORDERED in Chambers in Tampa, Florida, this 2nd day of July, 1982.

/s/ GEORGE C. CARR
UNITED STATES DISTRICT JUDGE